CUNNINGHAM *v.* STATE OF MARYLAND

[No. 502, September Term, 1966.]

406

*Decided July 6, 1967.*

The cause was argued before HAMMOND, C. J., and HOR-NEY, MARBURY, OPPENHEIMER, BARNES, McWILLIAMS and FINAN, JJ.

*Elsbeth Levy Bothe* for appellant.

*Lewis A. Noonberg, Asst. Attorney General,* with whom were *Francis B. Burch, Attorney General, Charles E. Moylan, Jr., State's Attorney for Baltimore City,* and *Joseph C. Howard, Asst. State's Attorney for Baltimore City,* on the brief, for appellee.

MARBURY, J., delivered the opinion of the Court.

John Wesley Cunningham, appellant, was indicted by the Grand Jury of Baltimore City for the murder of Dr. Louis Johnson on October 25, 1966. Appellant pleaded not guilty generally and elected to be tried before the Criminal Court of Baltimore, sitting without a jury. He was found guilty of murder in the first degree, without qualification as to capital punishment, and was sentenced to be executed. From the judgment on the verdict of guilty, Cunningham has appealed.

On October 25, 1966, a little after 9:00 p.m., Dr. Louis Johnson and his receptionist, Mrs. Margaret A. Pitman, closed and left the physician's office located at 301 E. 22nd Street in the City of Baltimore and walked around the corner to where Dr. Johnson's car was parked. Mrs. Pitman sat on the passenger side. The doctor walked to the driver's side, got in, and according to Mrs. Pitman, had not yet closed the car door when a man approached from the rear, exhibited a gun and pointed it at the doctor. The doctor asked him what was wanted and

was told something like "Come on." The doctor yelled for help and the man fired a single shot. Mrs. Pitman jumped out and saw another man standing behind the vehicle. The two men fled.

From her position and in the darkness, Mrs. Pitman did not get a look at the face of either man and was able to see only that the man with the gun was wearing something like a dark sport coat. She testified that she saw the hand of the man with the gun and was fairly certain that the hand appeared to be that of a colored man.

Dr. Johnson was removed by ambulance and was pronounced dead on arrival at Union Memorial Hospital. An autopsy performed the following day (the results of which were admitted by stipulation) revealed the cause of death as hemorrhage following a gun shot wound of the chest. Officer Rose and Sergeant Hajek, who came on the scene soon afterward, searched the vehicle. Officer Rose found a brass cartridge casing wedged in the chrome stripping running along the top of the vehicle. Sergeant Hajek recovered a bullet buried in the upholstery on the front seat below the steering wheel.

The weapon from which, according to expert testimony, the bullet and cartridge case had been fired and ejected came into the hands of the authorities through the cooperation of William L. Smith. Smith (who was the State's prime witness) testified that he was a friend of appellant and that prior to October 25, 1965, appellant frequently visited him. Three days before the homicide, the witness testified that he informed Sergeant James Watkins of the Baltimore City police that he, the appellant, and "two other male occupants of a car" were looking for a place to commit a robbery and that he "was in the car for the purpose of finding out where the robbery would be and who would participate in it and I would let him know as soon as it happened."

Smith testified that on October 25 the appellant and two others by the name of Borns and Holt met at his home; that the four of them left about 8:45 p.m. in an automobile owned and driven by appellant; that they drove eight blocks to within one block of Dr. Johnson's office; and that en route, Cunningham announced that he was "desperate for some money," and

"that he was going up to rob the doctor." Smith said he "tried to talk defendant out of it."

A thirty-two automatic was identified by Smith as a weapon which he had first seen that night when appellant took it out of his belt to load. He testified he had protested the use of the gun: "I said if he was going to rob the doctor, that he didn't need the gun, the doctor was old enough to rob with his hand."

Smith said that he and Borns declined to participate in the robbery and that the four men stood there until the doctor and "his nurse" started toward them. At that point, Cunningham and Holt advanced while the witness walked across the street and sat on a step approximately one half block from the doctor's car where he had a convenient view of the happenings there. Smith said he saw the doctor and the receptionist get into the doctor's vehicle and saw Cunningham walk around to the driver's side and open the door. He heard a shot and the doctor "hollering 'Oh, Oh'." Cunningham, he said, then fled while he proceeded to walk home.

About 10:30 that night, according to Smith, the four met again at Smith's home where Cunningham changed his clothes and left the gun in Smith's custody because Smith volunteered to get rid of it for him.

The next day (after police came to his house the night of the crime), Smith contacted Sergeant Watkins who picked him up in his private automobile. They proceeded to a graveyard where they parked and talked. He did not then tell the Sergeant he had the gun. On the following day, the sergeant and Smith met again for a talk in the sergeant's automobile; and Smith went back to his house, obtained the gun, and turned it over to the sergeant. In the meantime, appellant had been arrested, apparently as the result of the information procured from Smith. Smith was not charged in the instant case.

Cross-examined as to the background of his revelations to Sergeant Watkins, Smith said that he and the sergeant had had a "business-wise" relationship for five-six months before the homicide and that he passed on the information about the robbery being planned by himself, Cunningham, Borns and Holt "because I thought it would do me a lot of good." He claimed that his only motive in informing Sergeant Watkins was "be-

cause we were friendly." During the five-six months of their "friendship." Smith said he reported other "incidents like this to Sergeant Watkins." In return, "he done things for my family." Smith admitted that he had injected himself with heroin an hour before the killing of Dr. Johnson, but "that his condition was normal."

Smith denied that he had ever carried or used the murder weapon, but on cross-examination, altered his testimony somewhat and said that he had first seen the gun in Cunningham's car several weeks before the homicide instead of the day the crime occurred. He denied ownership of the gun.

Sergeant Watkins confirmed that the information and evidence implicating the appellant were supplied through his contacts with Smith, whom he had known about two years, and that Smith had given him information on other occasions. The sergeant said that, prior to the homicide, Smith had informed him that "the owner of the car and two other fellows, they were looking for a place to hold up and when they had decided on one he would let me know." Watkins testified that after hearing of the murder of Dr. Johnson, "the first thing came to my mind was go, seek out Smith at this time to see whether he knew anything about this assault and robbery." Contact with Smith had been made at the sergeant's initiative, and at their first meeting after the homicide (on October 26), Smith said "he thought he knew who had committed the murder," but did not say he knew who did it. The next day, the sergeant inquired of Smith "whether Cunningham had a gun"; Smith replied affirmatively and said he "could possibly get the gun for me at this time." That night (October 27) Smith gave the gun to the police.

Both Smith and the appellant were detained by the police at the time of appellant's arrest. Smith gave a statement in substantial conformity to his testimony at the trial, after which both Smith and the appellant were taken to a hospital to receive shots for their symptoms of narcotics withdrawal.

At the end of the first day of trial, and after the witnesses above mentioned had completed their testimony, the Assistant State's Attorney announced:

"Your Honor, it's 3:30. At this time, the State does not propose to call any other witnesses, but because of the hour, the State does not rest, but does indicate if you choose to call a break at this time."

When trial resumed the following day, the State called Joan Smith, wife of the witness William L. Smith. Mrs. Smith corroborated her husband's testimony on several important points. She stated that appellant had been at their home the night of the homicide and had left with her husband and "the other two fellows"; that Cunningham had returned later that evening and changed his coat and shirt; that she saw Cunningham give her husband a gun which she identified as being like the murder gun; and that she had given appellant's coat and shirt to the police.

Mrs. Smith said that her testimony at the trial was the first occasion on which she had mentioned that appellant gave the gun to her husband. She said she had come to the courthouse "because my husband was down there, and then Mr. Howard (the Assistant State's Attorney) wanted to see me." She denied that she had discussed her testimony with the Assistant State's Attorney. She "just told him what I knew."

Appellant's counsel moved for a mistrial on the basis that he had been surprised by Mrs. Smith's testimony, and the motion was denied. Appellant had not filed a Motion for Discovery.

During a recess after Mrs. Smith departed from the stand, several persons who had been in the courtroom during her testimony approached the Assistant State's Attorney and defense counsel and advised that Mrs. Smith had also been attending the trial the previous day despite the order of sequestration of witnesses. Appellant's counsel again suggested a mistrial. The court then took testimony on this issue, with the witnesses sequestered during each other's testimony.

Mrs. Lillian Borns (the mother of the Borns involved) testified that she had attended the entire trial. She did not know Mrs. Smith, but had seen her in the courtroom during Smith's testimony and that "she was sitting on that side, over there, near the back". She indicated the right rear of the courtroom.

Mrs. Laura Cunningham (appellant's mother) said that Mrs. Smith had been in the courtroom all the previous day. Mrs.

Cunningham pointed out the last seat on the right rear of the courtroom as the place she recalled was occupied by Mrs. Smith. "After you say all witnesses to go out, she still was in." Mrs. Cunningham was positive Mrs. Smith had been in the courtroom all afternoon.

Selma Goodman (Borns' sister) said she was attending the trial because of her brother's involvement in the case. She had not known Mrs. Smith who was pointed out to her as being Smith's wife. Mrs. Goodman said that Mrs. Smith had been in the courtroom during the morning and again during the afternoon.

Shirley Borns (Borns' wife) also said she had seen Mrs. Smith sitting in the courtroom the previous day and "during the trial, when the judge said for all witnesses to leave the room, she stayed in during the entire trial." This witness also designated the last row rear as the place occupied by Mrs. Smith the previous day.

Officer Charles Ittner testified that he had been assigned the previous day to guard witness Smith and, during the morning, had remained with his charge in the office of the Assistant State's Attorney. He said that Mrs. Smith had been with her husband "until we came down to the courtroom." Officer Ittner did not know whether Mrs. Smith had listened to her husband's testimony.

Recalled, Mrs. Smith denied that she had been in the courtroom the previous day. She had been with her husband in the State's Attorney's office during the morning. She said that in the afternoon she had remained out in the hall or in the State's Attorney's office while Smith was on the stand. She said she had not gone in the courtroom because "I didn't want to come in here. I get nervous."

Motion for Mistrial was denied. The court admonished the four witnesses to Mrs. Smith's presence in the courtroom, saying:

> "You ladies remain right here. I can only say this to you; that your accusations which the Court has found to be completely unfounded, have substantially delayed the orderly trial of this case. I am seriously considering holding each of you for contempt. You have made

an accusation which was completely unfounded. The woman was present in the courtroom, but present at the time all witnesses were called in to be admonished by this Court and that is the only time you saw her. You are obviously desperate people, and you have made a desperate move, and if this is repeated again, I intend to put you in jail."

Lieutenant Anton Glover of the Baltimore City police was then called by the State. He testified that he had first seen the appellant at about 3:30 p.m. on October 27 immediately after his arrest. Along with others, Glover interrogated him. Appellant initially denied any implication in the offense. During the afternoon, Smith was brought in to confront the appellant; and in the presence of appellant and the police officers, Smith said that he had turned over the gun to Sergeant Watkins. He also stated that "they had gone for the purposes of robbing Dr. Johnson and that appellant was responsible for shooting the doctor." To this, appellant was reported to have responded that he would await the results of the ballistics test and that if the gun turned out to be the murder weapon, he would "tell the truth."

Lieutenant Glover said that appellant had given another statement, but no statement was offered into evidence during the direct examination of the lieutenant. On cross-examination, appellant's counsel interrogated Lt. Glover about a written statement, and on re-direct, the State offered a written statement taken at 5:50 a.m. on October 28. However, after appellant objected, the State withdrew its offer.

After the recess, Lt. Glover (without objection) was recalled for continuation of re-direct examination. Lieutenant Glover testified that the appellant was in detention and under questioning from the time of his arrest until being returned to the cell block at 10:00 p.m. Appellant made the written statement at 5:30 the following morning. Lieutenant Glover testified that appellant's statement had been procured without force, threats or promises. According to him, no mention of obtaining the advice of counsel had been made by either appellant or the officers.

Appellant then took the stand and on examination, which was restricted to the question of voluntariness, said that he had been picked up while driving his car and had been taken to the station house where his car was searched and a jacket taken out. He said he had asked to telephone his wife in order to obtain an attorney, but was not allowed to do so. His requests were made twice; when first arrested, and before making the statement. He said he signed the statement because Officer Rose and Detective Cousins "was beating on me."

After cross-examination which largely dealt with appellant's claim of having been beaten, the State announced that it rested its case on voluntariness and offered the statement. The statement was admitted. The State then asked to withdraw the statement and, over objection, was allowed to produce two additional witnesses as to voluntariness.

Officers Cousins and Rose each took the stand and testified that they were present during parts of appellant's interrogations. They denied that they had exercised any violence upon Cunningham. Neither recalled appellant's making any request to secure counsel, or that he was advised of any right to counsel.

The statement contained the usual warning. In it, appellant admitted that on the day of the homicide, he picked up Borns and "Monk" (Holt) and then picked up Len (Smith). They went up to the bar at Guilford Avenue and 21st Street where they waited for the doctor. They had seen the doctor and "his nurse" getting into the doctor's car when he, Borns and "Monk" approached the car and "Len" stayed on the corner. He opened the door and asked the doctor to get out: "I said c-mon and he started hollering and the gun went off." They all ran off, then got into appellant's car, and "we went past Len's house, that's where we left the gun at."

In his statement, appellant said that "Len [Smith] planned the crime." He admitted ownership of the gun and that he had been dressed in a "dark green sport coat, it's the coat that you have upstairs, I kept it in the trunk of my car."

At the close of the State's case, motion for judgment of acquittal was made and denied.

In his defense, appellant produced one Paris Stokes. Stokes

testified that a few weeks before the homicide, Smith (in company with appellant) had forced his way into Stokes' home and that Smith had shot the witness with an "automatic pistol." Stokes said that he would be able to recognize the weapon if he saw it again. The witness was permitted to testify that he had seen Smith with a gun resembling the murder weapon.

Appellant produced his wife, Bernice Cunningham, who testified that at the time of the homicide, the appellant had been home with her and their children. Appellant took the stand on his own behalf. He said he had seen Smith earlier that day, but had left Smith's house about 5:30 p.m. He said that he had remained at his own home between the hours of 6:00 and 10:00 p.m. (the period in which the homicide occurred). He denied having seen Borns or Holt that day, although he knew them. He identified the murder weapon as the gun employed by Smith to shoot Stokes.

On cross-examination, appellant testified that he had been forced to give the statement and had lied, because he was frightened. He denied that he ever left or changed clothes at Smith's house. His criminal record consisted of one conviction for carrying a deadly weapon and one conviction for stealing an automobile.

Appellant presented four questions on appeal:

I. Was appellant's conviction obtained through suppression of evidence by the State or through the knowing use by the State of perjured testimony?

II. Did the trial court err in failing to grant a mistrial after hearing Mrs. Smith's testimony because of the alleged presence of Mrs. Smith in violation of a sequestration order when other testimony was being taken?

III. Did the trial court err in excluding the testimony of Paris Stokes that the witness William Smith possessed a gun resembling the murder weapon?

IV. Did the introduction into evidence of appellant's confession violate his constitutional rights?

*I*

The basis of appellant's first contention found in his brief was this:

"Had the State presented Smith in the light of an informing accomplice, who had secured immunity from prosecution in return for giving evidence against a potential co-defendant, the State's case would have been vitally compromised. Instead, the State dressed Smith up in the robes of an innocent informer, who, in the course of his efforts, became an anxious bystander to a heinous crime which he first thought to prevent and then help to vindicate.

"By putting Smith forward in this favorable posture, the State was engaging in a deliberate act of deception which required the suppression of evidence that Smith was, in fact, a confessed accomplice, and the knowing use of distorted testimony by both Smith and Sergeant Watkins."

A review of the entire record indicates that the State did not hold Smith out as an innocent informer. Smith was presented as a witness to the event. On cross-examination, defense counsel attacked Smith's credibility by pointing out that Smith had a past criminal record, that he was a paid informer, that he was a possible drug addict, and that he was a possible participant in the crime. The trier of the facts was fully informed as to the elements which weighed against the credibility of Smith, including his possible participation in the crime. The court below in its oral opinion considered Smith as an accomplice. It said, "The Court, * * *, is firmly convinced that there was a plan by at least four persons to rob * * * Dr. Johnson."

Sergeant Watkins testified on cross-examination that Smith had not been promised any reward or immunity before or after Smith's statement was taken. There was no evidence of a promise of leniency or other consideration for Smith's cooperation. Compare *Napue v. Illinois,* 360 U. S. 264, 3 L. Ed. 2d 1217 (1959). Watkins related what Smith had told him only after he was asked to do so on cross-examination. Watkins testified that Smith was at first reluctant to tell him about his dealings in the robbery; but because of their past friendship, Smith told Watkins what had happened. Smith told the sergeant that he did not have anything to do with the crime and had gone along for the express purpose of securing information as to where

the robbery was going to take place. The officer believed Smith because of the information Smith had given him in the past. There was no evidence that Smith's statement to Watkins and Smith's testimony were false or that the State knew them to be false. Compare *Alcorta v. Texas,* 355 U. S. 28, 2 L. Ed. 2d 9 (1957).

Appellant sought to demonstrate concealment by the State of "Smith's true role in the crime" by virtue of possible inconsistencies in the testimony of Sergeant Watkins and Lt. Glover relating to Smith's statements about his participation in the crime. The lieutenant testified that when Smith was brought in to confront appellant, Smith told the lieutenant that he and the others had made a plan to go out and hold up Dr. Johnson, but that he did not wish to go along because his face would be recognized. Lieutenant Glover stated that this was "the first time we knew Smith was implicated." Sergeant Watkins testified that Smith had warned him that the others were looking for someone to rob but he did not know whom, and that when the robbery attempt was made Smith had no part in it.

Cunningham's contention is without merit. This Court has held that even though testimony by a prosecuting witness who might have been a participant in the crime and by corroborating witnesses was inconsistent as to some details, the credibility of the witnesses and the weight of the evidence were for the trier of the facts to determine. *McKenzie v. State,* 236 Md. 597, 204 A. 2d 678. In *Dyson v. State,* 226 Md. 18, 22, 171 A. 2d 505, cert. den. 368 U. S. 968, 7 L. Ed. 2d 397, this Court noted that discrepancies in the witnesses' testimony did not constitute "perjured testimony," but were matters for the consideration of the trier of the facts.

## II

Appellant's second contention that the trial court erred in failing to grant a mistrial because of the alleged presence of Mrs. Smith when testimony of other witnesses was being taken is also without merit. Mrs. Smith denied having been in the courtroom during the taking of other witnesses' testimony. This was corroborated by the testimony of Officer Ittner. The court chose to believe these two witnesses rather than those who placed Mrs. Smith in the courtroom during the critical time.

The credibility of the witnesses was for the trier of the facts, and its determination will not be set aside by this Court unless clearly erroneous. *McDowell v. State,* 231 Md. 205, 189 A. 2d 611; Maryland Rule 886 a. Even if there was a violation of the sequestration order, this would not, of itself, require a reversal. It is within the discretion of the trial judge to determine whether to admit the testimony of the witness where there has been a violation of the exclusion order. *Mayson v. State,* 238 Md. 283, 208 A. 2d 599.

In argument in his brief on the second contention, appellant also contended that the State "engaged in suppressing and distorting evidence" when it permitted Mrs. Smith to present "testimony which the agents of the State knew to be false and inaccurate." He argued that if Mrs. Smith's testimony was true that the appellant changed his clothes after the crime and left at her house the clothing worn by him, the State would have introduced the clothing. The State did not introduce it, because, appellant alleged, it knew that Mrs. Smith's testimony was untrue.

Appellant testified that the clothes were taken out of the trunk of his car when he was arrested. Since there was no evidence that Mrs. Smith's tesimony was false, the conflict between the two stories was for the trier of the facts. *Dyson v. State, supra.*

At the trial, Cunningham's counsel was aware that the police had custody of the clothing and had not introduced it into evidence. He could have demanded that the clothing be produced or could have cross-examined Mrs. Smith as to the details surrounding the release of the clothing to the police. Justice White pointed out in his concurring opinion in *Giles v. Maryland,* 386 U. S. 66, 17 L. Ed. 2d 737, 757 (1967), that: "In the end, any allegation of suppression boils down to assessment of what the State knows at trial in comparison to the knowledge held by the defense."

### III

The third contention of Cunningham was that the court erred in excluding testimony that the witness Smith possessed a gun resembling the murder weapon. This contention is in conflict with the record because the court did not exclude this testimony. On direct examination by counsel for the appellant, this ques-

tion was asked of Paris Stokes; and the following answer was given:

"Q. Does this gun [the murder weapon] look the same as the gun that Mr. Smith shot you with? A. It resembles that, yes."

## IV

The final contention raised by appellant was that his confession was inadmissible because he was not told of his right to have counsel, that he was not warned of his right to remain silent, that he was beaten, and that he was held incommunicado.

Appellant's trial took place on May 12 and 13, 1966, after the Supreme Court decision in *Escobedo v. Illinois,* 378 U. S. 478, 12 L. Ed. 2d 977 (June 22, 1964), but before its decision in *Miranda v. Arizona,* 384 U. S. 436, 16 L. Ed. 2d 694 (June 13, 1966). The *Miranda* standards are to be applied only prospectively from June 13, 1966, and they include the implications contained in the *Escobedo* opinion. *Johnson v. New Jersey,* 384 U. S. 719, 16 L. Ed. 2d 882 (1966). As the Supreme Court stated in *Johnson*:

"As for the standards laid down one week ago in *Miranda,* if we were persuaded that they had been fully anticipated by the holding in *Escobedo,* we would measure their prospectivity from the same date. Defendants still to be tried at that time would be entitled to strict observance of constitutional doctrines already clearly foreshadowed. The disagreements among other courts concerning the implications of *Escobedo,* however, have impelled us to lay down additional guidelines for situations not presented by that case. This we have done in *Miranda,* and these guidelines are therefore available only to persons whose trials had not begun as of June 13, 1966." 16 L. Ed. 2d 892-893.

In *Westfall v. State,* 243 Md. 413, 221 A. 2d 646, it was pointed out that under the existing law in this state applicable to cases tried after *Escobedo* but prior to *Miranda,* "even if the defendant had been given absolutely no warning that the statements could later be used against him, it would not make the

oral confession inadmissible." And further, "that fact, plus absence of counsel at the time of interrogation, would not make the confessions which resulted therefrom inadmissible." 243 Md. at 420. Compare *Davis v. North Carolina,* 384 U. S. 737, 16 L. Ed. 2d 895, where the Supreme Court decided that in cases commenced before *Miranda,* failure to advise an accused of his right to have counsel present during interrogation and failure to advise him of his right to remain silent were significant factors in determining the voluntariness of a confession, although a conviction based on such a confession would not be reversed on those grounds alone.

At the time of the appellant's trial, this Court had construed *Escobedo* to be applicable only to cases where the factual situation was analogous to that in *Escobedo* where the accused made repeated requests to consult with his attorney, the attorney was refused access to his client, and the confession was procured while the accused was held in custody under those particular circumstances. *Mefford and Blackburn v. State,* 235 Md. 497, 201 A. 2d 824, cert. den. 380 U. S. 937, 13 L. Ed. 2d 825. See also Note, *The Right to Counsel During Police Interrogation,* 25 Md. L. Rev. 165 (1965).

This Court has also decided that if the confession was found to be free and voluntary under the totality of the circumstances, the affirmative advising of the right to counsel before the taking of a confession was not a prerequisite to its admissibility, *Cowans and Hayes v. State,* 238 Md. 433, 209 A. 2d 552; nor did absence of counsel itself affront due process since it does not necessarily indicate an overborne or compelled will, *Mefford and Blackburn v. State, supra* (See also *Mefford v. Warden,* 270 F. Supp. 745, Civil No. 17742, D. Md., June 23, 1967, wherein Thomsen, C. J., after an evidentiary hearing on an application for a writ of habeas corpus, held that Mefford's confession was voluntary and admissible in evidence on grounds additional to those discussed in *Mefford and Blackburn v. State.*); nor did failure to advise of the right to remain silent in itself render a confession inadmissible. *Westfall v. State, supra.*

Cunningham was arrested at about 2:30 p.m. on October 27, 1965. He was taken to Northern police station in Baltimore

for interrogation which began at 3:30 p.m. He was placed in a cellblock at approximately 10:00 p.m.; and the following morning, October 28, at about 5:50, he was again seen by police. After he was warned that what he said would be used against him, he signed the statement after it was read to him. Appellant claimed that the only reason he had signed the statement was that his request to call his wife had been refused, that he was beaten over the head with a telephone book, that he had been struck in the chest repeatedly, and that he had been given no supper. The officers who conducted the interrogation denied that appellant had been struck or that he had requested to make a telephone call. They testified that he had been given supper and that no threats, abuses, or promises were used or made to induce appellant to make a statement.

The court below found that appellant's testimony concerning his treatment by the police was completely unsubstantiated. The trial judge heard the testimony of the appellant and the officers. The court was in the best position to judge the credibility of the witnesses. The judge was fully aware of the fact that prior to interrogation, appellant had not been warned of his right to counsel or of his right to remain silent and that appellant was advised of his right to remain silent shortly before he made the statement. Where the trial judge sits without a jury, his determination as to whether a statement was freely and voluntarily given will not be disturbed on appeal in the absence of a showing of abuse of discretion, *Crowe and Williston v. State,* 240 Md. 144, 213 A. 2d 558; *Oakley, Etc. v. State,* 238 Md. 48, 207 A. 2d 472, cert. den. 384 U. S. 1021, 16 L. Ed. 2d 1022. We find no such abuse of discretion under the totality of the circumstances.

*Judgment affirmed.*