## DONALD RAY WATSON v. STATE OF MARYLAND

[No. 56, September Term, 1977.]

*Decided February 10, 1978.*

74

The cause was argued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and reargued before MURPHY, C. J., and SMITH, DIGGES, LEVINE, ELDRIDGE and ORTH, JJ., and ANSELM SODARO, Chief Judge of the Eighth Judicial Circuit, specially assigned.

Argued and reargued by *Michael R. Malloy, Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellant.

Argued and reargued by *Gilbert H. Robinette, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Clarence W. Sharp, Assistant Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. DIGGES, LEVINE and ELDRIDGE, JJ., dissent and ELDRIDGE, J., filed a dissenting opinion in which DIGGES and LEVINE, JJ., concur at page 84 *infra.*

We shall here affirm the determination of the Court of Special Appeals in *Watson v. State,* 35 Md. App. 381, 370 A. 2d 1149 (1977), that appellant, Donald Ray Watson (Watson), effectively waived his right to have counsel present when he made an inculpatory statement. We granted the writ of certiorari to consider the matter in the light of *Brewer v. Williams,* 430 U. S. 387, 97 S. Ct. 1232, 51 L.Ed.2d 424 (1977).

At a court trial in the Circuit Court for Baltimore County Watson was convicted of robbery with a deadly weapon and the use of a handgun in the commission of a crime of violence. The facts were set forth for the Court of Special Appeals by

Judge Liss. We shall repeat only those facts necessary to a clear understanding of the narrow issue which we shall address. An agreed statement of facts was submitted to us under Maryland Rule 828 g.

The robbery in question took place on January 5, 1976, at approximately 12:20 p.m. Watson was arrested at 1:05 p.m. while driving the automobile which had been used in the robbery. *Miranda* warnings were read to him at that time. Detective John Hopkins (Hopkins) of the Baltimore County Police Department, who was in charge of the case, called Watson's mother to inform her of the charges against Watson. He replied in the affirmative to her inquiry as to whether Watson would need a lawyer. Watson was told that his mother had been called. He was again advised of his *Miranda* rights at about 4:30 p.m. on the same day. Upon being told that the State's Attorney would be so advised if Watson assisted Hopkins in the investigation of the robbery, Watson made an exculpatory oral statement, which the parties agree was properly admitted into evidence. Upon completion of this statement Hopkins told Watson that he did not believe his story. Watson requested a lawyer. He was allowed to call his mother.

Private defense counsel was hired. The attorney in question spoke with Hopkins on each of the days of two separate preliminary hearings. While they were in the courthouse for the second hearing, Hopkins told the attorney that he had doubts about Watson's guilt and suggested that Watson take a lie-detector (polygraph) test. Counsel agreed to the suggestion and instructed Watson, in the presence of Hopkins, "You are to go to meet with Detective Hopkins when he calls you at a scheduled date. ... Under any circumstances, you are not to give any statement beyond the polygraph examination." Counsel told Hopkins that he was not to question Watson except for the questioning involved in the polygraph test. Hopkins agreed. When Hopkins advised counsel of the scheduled date for the polygraph test, he agreed to call counsel and to let him know the result of the test.

The test was administered. The polygraph operator told Watson that he had failed the test. The operator then advised Hopkins by telephone to come around because the test was over, that Watson had failed, and that Watson wanted to talk to Hopkins. Hopkins twice attempted to call the defense attorney to advise him that Watson had failed the test. The attorney was out of the office on both occasions. Approximately 20 minutes after the test was over Hopkins entered the polygraph room, informed Watson that he had unsuccessfully attempted to reach his attorney, and stated, "I understand you have something you want to tell me, but, first of all, I'm going to read your rights again." Watson was then again informed of his *Miranda* rights, which advice did not include, however, any reference to the instruction of counsel to make no statement nor counsel's request that Hopkins not question Watson. Watson then affirmatively stated that he understood his rights, that he wanted to talk to the detective, and that "he wanted to get something off his chest." The inculpatory statement then followed.

The trial judge said in his ruling on the motion to suppress the inculpatory statement:

> "The defendant, in this case, has testified on this issue, and he has stated that he did not call Detective Hopkins; that he was taken to Detective Hopkins; that he didn't say anything except that he knew Jerome Moore [, one of the robbery suspects]. There were other officers present who said they didn't believe him; that during the course of the polygraph, the officer administering the polygraph said, 'You did not?' He said, 'No.' 'Did you drive the car?' He said, 'No,' and he was told that he wasn't believed. He told Detective Hopkins that he wanted to call his attorney, and that after a number of statements were made by Detective Hopkins as to what Detective Hopkins said happened, then, after that, he was read his rights, and that's how the incident occurred on February 11th, '76.

> "In contrast to that, Detective Hopkins states that, yes, he did speak to Mr. Kroop [(Watson's

attorney)], that it was agreed that he was to take the polygraph test, that he would not conduct an interview with the defendant. Detective Hopkins said that the defendant was administered the polygraph test, that he was informed that he did not pass same, that he was informed that the defendant wanted to talk to him; that, still, at this point, he read the *Miranda* rights to him. Now, at this point, looking at the totality of the circumstances, we have a situation where the defendant is read his rights for the third time, and has said for the third time that he understands them; also, a situation where he has had access to an attorney and access to a good attorney who, unquestionably, advised him, and Detective Hopkins so stated, not to say anything during the course of this polygraph test, yet the defendant still chooses to make a statement, according to the testimony of Detective Hopkins.

". . . [T]he testimony of Detective Hopkins is that this is what occurred, that he did, again, advise him of his rights, and that a statement was given, and I accept the testimony of Detective Hopkins . . . .

"I don't believe the sequence of events as described to me by the defendant in this case. I will say, however, that the statements given by the defendant do not indicate to me that he was put upon or lulled into some kind of sense of false security by virtue of having been administered a polygraph test. I don't feel that, based on what he says transpired, that was the situation that existed at the time the polygraph was completed, and I think that the statement was given voluntarily with the understanding of his *Miranda* rights, and having been given good advice by his counsel, he chose to ignore it at that particular time. Then, I don't know of any duty on the detective to contact the attorney and tell him the situation. He did try to call him, as he said, to tell him what the results of the polygraph were, but was unable to contact him, which is,

certainly, understandable, with attorneys' trial schedules being busy, it is understandable that such things as that would happen on this occasion, so I will rule that the statement given on February 11th, '76, is admissible."

As Chief Judge Brune observed for the Court in *McDowell v. State,* 231 Md. 205, 211, 189 A. 2d 611 (1963), "The credibility of witnesses is primarily for the determination of the trier of facts. *McKenzie v. State,* 230 Md. 513, 514, 187 A. 2d 885 [(1963)]." *Accord, Cunningham v. State,* 247 Md. 404, 417, 231 A. 2d 501 (1967), *cert. denied,* 390 U. S. 908 (1968). Under Rule 886 "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous . . . ."

In *State v. Blizzard,* 278 Md. 556, 567, 366 A. 2d 1026 (1976), in determining whether an individual had been denied his right to counsel under the Sixth Amendment to the Constitution of the United States and Article 21 of the Maryland Declaration of Rights, we considered and rejected "[t]he broad or liberal rule, called by some the 'per se' rule," which we said "represent[ed] the distinct minority view," espoused by some as to the application of *Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964). Under the "per se" rule, as stated in *United States v. Thomas,* 474 F. 2d 110, 112 (10th Cir.), *cert. denied,* 412 U. S. 932 (1973), "[O]nce a criminal defendant has either retained an attorney or had an attorney appointed for him by the court, any statement obtained by interview from such defendant may not be offered in evidence for any purpose unless the accused's attorney was notified of the interview which produced the statement and was given a reasonable opportunity to be present." The "per se" rule is also espoused in *United States ex rel. O'Connor v. State of New Jersey,* 405 F. 2d 632, 636 (3d Cir.), *cert. denied,* 395 U. S. 923 (1969); *Hancock v. White,* 378 F. 2d 479, 482 (1st Cir. 1967); *State v. Gallagher,* 97 Ariz. 1, 7, 396 P. 2d 241 (1964); *State v. Witt,* 422 S.W.2d 304, 309 (Mo. 1967); and *State v. Green,* 46 N. J. 192, 215 A. 2d 546, 551 (1965), *cert. denied,* 384 U. S. 946 (1966).

In *Brewer v. Williams,* 430 U. S. 387, the défendant, Williams, was arrested for abducting a 10-year-old girl on Christmas Eve. Two days after she disappeared he turned himself in to the police at Davenport, Iowa, a town located approximately 160 miles from the place of her abduction, Des Moines. He received the assistance of counsel at Davenport as well as by communication by telephone with a lawyer at Des Moines. His attorney in Des Moines advised him that the police were to drive out, pick him up, and bring him back to Des Moines. He told Williams that they had agreed not to question him during the trip. Williams was instructed to make no statement of any kind to the police. Similar advice was given to him by the attorney in Davenport. That attorney became apprehensive when the police officer who came to pick up Williams repeated the *Miranda* warnings and then said, "I want you to remember this because we'll be visiting between here and Des Moines." The attorney asserted to the police officer that there was an agreement that there would be no interrogation during the ride. He requested permission to ride back to Des Moines with Williams in the police car, but his request was refused. As the Court put it:

> "The two detectives, with Williams in their charge, then set out on the 160-mile drive. At no time during the trip did Williams express a willingness to be interrogated in the absence of an attorney. Instead, he stated several times that '[w]hen I get to Des Moines and see Mr. McKnight [(his attorney)], I am going to tell you the whole story.' Detective Leaming knew that Williams was a former mental patient, and knew also that he was deeply religious." *Id.* at 392.

In fact, the Court had said earlier in its opinion that Williams "had recently escaped from a mental hospital . . . ." A wide-ranging conversation took place covering a variety of topics, including religion. Addressing Williams as "Reverend," the detective gave what has since been referred to as the "Christian burial speech":

> " 'I want to give you something to think about while we're traveling down the road. . . . Number one, I

want you to observe the weather conditions, it's raining, it's sleeting, it's freezing, driving is very treacherous, visibility is poor, it's going to be dark early this evening. They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is, that you yourself have only been there once, and if you get a snow on top of it you yourself may be unable to find it. And, since we will be going right past the area on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered. And I feel we should stop and locate it on the way in rather than waiting until morning and trying to come back out after a snow storm and possibly not being able to find it at all.' " *Id.* at 392-93.

In response to a question from Williams as to why the detective thought the route to Des Moines would be taking them past the girl's body, the detective replied that he knew the body was in the area of a certain town that they were passing. The Court said the detective actually had no such knowledge. The officer stated, "I do not want you to answer me. I don't want to discuss it any further. Just think about it as we're riding down the road." Williams reflected on the officer's comment and ultimately directed the police to the body. Judicial proceedings had been initiated before the beginning of the automobile ride. The Court said, "There can be no serious doubt, either, that Detective Leaming deliberately and designedly set out to elicit information from Williams just as surely as — and perhaps more effectively than — if he had formally interrogated him." *Id.* at 399. In fact, by footnote it said that at argument before it the Attorney General of Iowa conceded that this "Christian burial speech" was tantamount to interrogation. *Id.* at 399 n.6. The Court stated, "It ... requires no wooden or technical application of the *Massiah* doctrine to conclude that Williams

was entitled to the assistance of counsel guaranteed to him by the Sixth and Fourteenth Amendments." *Id.* at 401. It noted "that Williams had been informed of and appeared to understand his right to counsel," adding:

"But waiver requires not merely comprehension but relinquishment, and Williams' consistent reliance upon the advice of counsel in dealing with the authorities refutes any suggestion that he waived that right." *Id.* at 404.

It concluded:

"Despite Williams' express and implicit assertions of his right to counsel, Detective Leaming proceeded to elicit incriminating statements from Williams. Leaming did not preface this effort by telling Williams that he had a right to the presence of a lawyer, and made no effort at all to ascertain whether Williams wished to relinquish that right. The circumstances of record in this case thus provide no reasonable basis for finding that Williams waived his right to the assistance of counsel.

"The Court of Appeals did not hold, nor do we, that under the circumstances of this case Williams *could not,* without notice to counsel, have waived his rights under the Sixth and Fourteenth Amendments. It only held, as do we, that he did not." *Id.* at 405-06. (Footnote omitted.) (Emphasis in original.)

We regard it as significant that Mr. Justice Powell said in his concurring opinion:

"The dissenting opinion of The Chief Justice states that the Court's holding today 'conclusively presumes a suspect is legally incompetent to change his mind and tell the truth until an attorney is present.' *Post,* at 419. I find no justification for this view. On the contrary, the opinion of the Court is explicitly clear that the right to assistance of counsel may be waived, after it has attached, without notice to or consultation with counsel. *Ante,* at 405-406. We

> would have such a case here if petitioner had proved
> that the police officers refrained from coercion and
> interrogation, as they had agreed, and that Williams
> freely on his own initiative had confessed the crime."
> *Id.* at 413.

This makes it clear that the Court was not adopting any rule which would have the effect of holding that an individual may not waive his right to have counsel present once he has obtained counsel. Indeed, such a rule would be directly contrary to the holding of the Court in *Faretta v. California,* 422 U. S. 806, 837, 95 S. Ct. 2525, 45 L.Ed.2d 562 (1975), to the effect that an accused has an absolute right to proceed without a lawyer at trial once he is aware of the consequences. Mr. Justice Powell's opinion also makes clear that if we were to find here that Watson did indeed waive the right to assistance of counsel and then "freely on his own initiative ... confessed the crime," the statement is admissible.[1]

It will be recalled that in *Massiah* a merchant seaman was arrested and subsequently indicted for possession of narcotics aboard a United States vessel. He retained counsel and pleaded not guilty. He and a codefendant were released on bail. Without his knowledge, the codefendant decided to cooperate with the government agents in their continuing investigation of the narcotics activities in which the codefendant and others had been involved. With the permission of the codefendant, a radio transmitter was installed under the front seat of the codefendant's automobile, allowing conversations carried on in the car to be overheard by a narcotics agent from some distance away. Massiah made several incriminating statements during the course of the conversation with his codefendant. These incriminating statements were brought before the jury at

---

1. Waiver cases decided since *Brewer* are in accord with this view. *See* United States v. Hale, 562 F. 2d 336 (5th Cir. 1977); Nash v. Estelle, 560 F. 2d 652 (5th Cir. 1977); United States v. Monti, 557 F. 2d 899 (1st Cir. 1977); United States v. McCain, 556 F. 2d 253 (5th Cir. 1977); and United States v. Koch, 552 F. 2d 1216 (7th Cir. 1977). *But see* United States v. Satterfield, 558 F. 2d 655 (2d Cir. 1976). *See also* United States v. Finch, 557 F. 2d 1234 (8th Cir. 1977).

trial through the testimony of narcotics agents. It was in this circumstance that the Supreme Court held "that the defendant's own incriminating statements, obtained by federal agents under the circumstances [t]here disclosed, could not constitutionally be used by the prosecution as evidence against *him* at his trial." 377 U. S. at 207 (Emphasis in original.)

In *State v. McKay,* 280 Md. 558, 569-70, 375 A. 2d 228 (1977), Judge Levine reviewed for this Court the many rights which an accused may waive, including the right to counsel. J. Israel and W. LaFave, *Criminal Procedure in a Nutshell* 237 (2d ed. 1975) makes the point "that the Sixth Amendment is a right of the client and not the lawyer," a fact which may sometimes be overlooked by counsel. The Supreme Court in *Brewer* recognized, as we have already pointed out, that the right could be waived, but said it had not been waived there.

There are significant differences between this case and *Brewer* and *Massiah.* There was no surreptitious activity in this case as in *Massiah;* nor do we have such trickery as was present in *Miller v. California,* 392 U. S. 616, 88 S. Ct. 2258, 20 L.Ed.2d 1332 (1968), in which the writ of certiorari was dismissed as improvidently granted. *Miller,* of course, was subsequent to *Massiah.*

In *Brewer,* as we have already pointed out, it was conceded that the "Christian burial speech" was an interrogation tactic. In fact, Mr. Justice Powell said of this:

> "I join the opinion of the Court which also finds that the efforts of Detective Leaming 'to elicit information from Williams,' as conceded by counsel for petitioner at oral argument, *ante,* at 400 n. 6, were a skillful and effective form of interrogation. Moreover, the entire setting was conducive to the psychological coercion that was successfully exploited. Williams was known by the police to be a young man with quixotic religious convictions and a history of mental disorders. The date was the day after Christmas, the weather was ominous, and the setting appropriate for Detective Leaming's talk of

snow concealing the body and preventing a 'Christian burial.' Williams was alone in the automobile with two police officers for several hours. It is clear from the record, as both of the federal courts below found, that there was no evidence of a knowing and voluntary waiver of the right to have counsel present beyond the fact that Williams ultimately confessed. It is settled law that an inferred waiver of a constitutional right is disfavored. *Estelle v. Williams*, 425 U. S. 501, 515 (1976) (Powell, J., concurring)." 430 U. S. at 412.

The polygraph test here was no trick or coercive tactic; Watson willingly submitted to it. It was after this that he took matters in his own hands. There is nothing in the record before us to indicate that Watson is in any way other than a normal individual mentally. We have here no psychological coercion as in *Brewer*.

We do have a conflict of evidence as to just what took place after the completion of the polygraph test. Although we have an obligation to make an independent constitutional appraisal on the issue of waiver of counsel, we are in no position to judge the credibility of the witnesses since we neither heard nor saw them. The trial judge did have the opportunity to observe their demeanor. This is obviously a case where one must choose between conflicting statements, and we cannot say the trial judge was clearly in error in concluding that Watson was being untruthful and the police were being truthful in their recitation of the facts. The facts, as found by the trial judge, if true, would clearly add up to a knowing, intelligent, effective waiver of counsel by Watson. Accordingly, we find no error.

> *Judgment affirmed; appellant to pay the costs.*

*Eldridge, J., dissenting:*

After the defendant Watson was arrested, he specifically requested a lawyer, and retained a private attorney. The record shows that Watson thereafter relied on the advice of

his attorney. Thus, after charges had been filed and on the date of his second preliminary hearing, Watson, acting under the instructions of his attorney, agreed to take a polygraph examination. Watson's attorney secured from the police an agreement that they would conduct no interrogation of Watson except for the questioning involved in the polygraph examination, and Watson knew of this agreement. However, despite the agreement, the police interrogated Watson after the polygraph examination had been completed. Watson gave a statement apparently intended to be exculpatory, but which in fact incriminated him by placing him at the scene of the crime. Watson was subsequently convicted, the trial court relying substantially on this statement.

Neither the majority nor the State dispute that an interrogation of Watson without his retained counsel took place at a critical stage of the proceedings, and consequently it is not disputed that Watson was entitled to the assistance of his counsel guaranteed to him by the Sixth Amendment to the United States Constitution and Art. 21 of the Maryland Declaration of Rights. *Massiah v. United States,* 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964). As previously stated by this Court in *Elliott v. Warden,* 243 Md. 627, 631, 222 A. 2d 55 (1966):

> "Under the *Massiah* test, absent an effective waiver of Sixth Amendment rights, no inculpatory statement which is made by an indicted declarant will be allowed into evidence against him if such statement is elicited from the accused when he does not have counsel present."

Thus, the only issue before the Court is whether Watson waived his right to the assistance of counsel.[1]

---

1. The majority states, in attempting to distinguish this case from Massiah v. United States, 377 U. S. 201, 84 S. Ct. 1199, 12 L.Ed.2d 246 (1964), and Brewer v. Williams, 430 U. S. 387, 97 S. Ct. 1232, 51 L.Ed.2d 424 (1977), that "there was no surreptitious activity in this case as in *Massiah*" and that "[i]n *Brewer* . . . it was conceded that the 'Christian burial speech' was an interrogation tactic." It is important to note that these distinctions are of little moment to the disposition of the instant case. *Massiah,* exclusively, and *Brewer,* in part, were concerned with whether the Sixth Amendment right to and need for assistance of counsel had attached at all. It is in consideration

The majority emphasizes that this right *can* be waived. This is, of course, true. Significantly, however, the majority makes no mention whatsoever of the rigorous standards which must be satisfied before a court may find that the constitutional right to counsel has been waived.

The Supreme Court recently reiterated these rigorous standards in *Brewer v. Williams,* 430 U. S. 387, 404, 97 S. Ct. 1232, 51 L.Ed.2d 424 (1977):

> "The District Court and the Court of Appeals were also correct in their understanding of the proper standard to be applied in determining the question of waiver as a matter of federal constitutional law — that it was incumbent upon the State to prove 'an intentional relinquishment or abandonment of a known right or privilege.' *Johnson v. Zerbst,* 304 U. S.,at 464. That standard has been reiterated in many cases. We have said that the right to counsel does not depend upon a request by the defendant. *Carnley v. Cochran,* 369 U. S. 506, 513; *cf. Miranda v. Arizona,* 384 U. S., at 471, and that courts indulge in every reasonable presumption against waiver, *e.g., Brookhart v. Janis, supra,* at 4; *Glasser v. United States,* 315 U. S. 60, 70."

It is abundantly clear that, in order to establish the waiver of a defendant's Sixth Amendment right to counsel, an "appropriately heavy burden" lies with the State. *Schneckloth v. Bustamonte,* 412 U. S. 218, 236, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973).

---

of this question that "surreptitious activity" and the "Christian burial speech" were significant. For example, in Brewer v. Williams, *supra,* 430 U. S. at 401, it was *because* the Christian burial speech was "tantamount to interrogation" that the Court stated:

> "It thus requires no wooden or technical application of the *Massiah* doctrine to conclude that [the defendant] ... was entitled to the assistance of counsel...."

In the instant case, however, the interrogation was express, and hence it is manifest that Watson was entitled to assistance of counsel. Whether or not this right was waived is here, as in *Brewer,* a separate inquiry.

Furthermore, the Supreme Court emphasized in *Brewer v. Williams, supra,* 430 U. S. at 404, that:

"This strict standard applies equally to an alleged waiver of the right to counsel whether at trial or at a critical stage of pretrial proceedings. *Schneckloth v. Bustamonte,* 412 U. S. 218, 238-240; *United States v. Wade,* 388 U. S., at 237."

It is clear, therefore, that the determination of the validity of Watson's alleged waiver must be judged with the same scrutiny it would receive had he attempted this waiver at trial. The Supreme Court has been explicit in this regard — an examination into the knowing and understanding nature of the waiver must be conducted. As the Court stated in *Von Moltke v. Gillies,* 332 U. S. 708, 723-724, 68 S. Ct. 316, 92 L. Ed. 309 (1948):

"To discharge this duty [of assuring the intelligent nature of the waiver] properly in light of the strong presumption against waiver of the constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand. The fact that an accused may tell him that he is informed of his right to counsel and desires to waive this right does not automatically end the judge's responsibility. To be valid such waiver must be made with an apprehension of the nature of the charges, the statutory offenses included within them, the range of allowable punishments thereunder, possible defenses to the charges and circumstances in mitigation thereof, and all other facts essential to a broad understanding of the whole matter. A judge can make certain that an accused's professed waiver of counsel is understandingly and wisely made only from a penetrating and comprehensive examination of all the circumstances under which such a plea is tendered."

The majority makes no serious attempt to view the facts of this case in light of these long established standards. It

rests content with the statements, "he took matters in his own hands [and appears to be] a normal individual mentally." This is insufficient.

An examination of the record in the instant case persuades me that the State has fallen short of satisfying its heavy burden.

The facts in the instant case present a defendant in the aftermath of a polygraph examination, circumstances highly unsettling, which were further charged by the polygraph operator's having accused Watson of lying. It was under the pressure of these circumstances, and faced with this accusation, that Watson (according to the police testimony) requested to see his interrogator and made his incriminating statement.

If psychological pressure such as this were purposefully applied by the State to elicit a confession, it would be labeled coercive and condemned. *Cf. Johnson v. State,* 31 Md. App. 303, 355 A. 2d 504 (1976). However, even if Watson's statement may have been "voluntary" for purposes of the self-incrimination clause of the Fifth Amendment, I do not believe, given the circumstances in which it occurred, that it implies a waiver which can be deemed voluntary "with 'regard . . . [to] the higher standard with respect to waiver of the right to counsel that applies when the Sixth Amendment has attached.' " *United States v. Satterfield,* 558 F. 2d 655, 657 (2d Cir. 1977), quoting Judge Friendly, dissenting in *United States v. Massimo,* 432 F. 2d 324, 327 (2d Cir. 1970), *cert. denied,* 400 U. S. 1022, 91 S. Ct. 586, 27 L.Ed.2d 633 (1971). This Court should be reluctant to find voluntary waivers of the right to counsel in circumstances so laden with psychological stress, whether or not this stress is intentionally induced by the State.

Furthermore, Watson's interrogator testified that, on meeting with Watson, he stated to him, "I understand you have something to tell me, but first of all I'm going to read you your rights." The very form of this statement under the circumstances, *i.e.,* "first of all," suggests that it was an invitation to ignore the substance of what followed. However, in any event, what followed was a mere recitation of the standard *Miranda* litany, telling Watson, *inter alia,* that the

State would furnish him with a lawyer if he could not afford to hire one. This litany, of course, was not pertinent inasmuch as Watson *already had* an attorney and had just taken the lie detector test upon his lawyer's instructions. The interrogator did not ask Watson if he wished to waive the services of the attorney he had already retained. *See United States v. Springer,* 460 F. 2d 1344, 1355 n. 3 (7th Cir. 1972) (Judge John Paul Stevens dissenting). He did not contact defendant's counsel. *See United States v. Thomas,* 474 F. 2d 110, 112 (10th Cir. 1973), *cert. denied,* 412 U. S. 932, 93 S. Ct. 2758, 37 L.Ed.2d 160 (1973). He did not explain or suggest to Watson the possible consequences of proceeding without the advice of counsel. *Von Moltke v. Gillies, supra,* 332 U. S. 708.

Finally, the interrogator flatly breached his agreement with Watson's attorney by questioning Watson in the attorney's absence. The interrogator did not mention that agreement. Watson knew of the agreement but made no reference to it which might suggest that he was disavowing it. As the Supreme Court said about the similar agreement in *Brewer v. Williams, supra,* 430 U. S. at 405, in concluding that there had been no waiver of counsel:

> "Williams knew of that agreement and, particularly
> in view of his consistent reliance on counsel, there
> is no basis for concluding that he disavowed it."

What the police did in the present case was to take advantage of the stress of the moment and deprive Watson of the right to assistance of counsel, a right which he had expressly and effectively "asserted . . . by having secured [an attorney who] acting as his agent . . . had made clear to the police that no interrogation was to occur . . . ." *Brewer v. Williams, supra,* 430 U. S. at 405.

In light of these facts, and faced with the admonition that a court must "indulge in every reasonable presumption against waiver," I cannot agree with the majority's finding that Watson made a voluntary, knowing and intelligent waiver of his right to assistance of counsel.

Finally, it must additionally be noted that the majority's opinion does much to undermine the efficient and orderly

administration of justice. The ability of a defense attorney to cooperate with the State in criminal proceedings, while at the same time protecting his client's interests, is very much dependent on his ability to rely on the promises and commitments of the State. *Cf. State v. Brockman,* 277 Md. 687, 357 A. 2d 376 (1976). If, however, the State may breach its commitments at its pleasure, the basis for such cooperation is vitiated. Precisely the same considerations apply in the instant case as those stated by Mr. Justice Stevens, concurring in *Brewer v. Williams, supra,* 430 U. S. at 415:

> "Underlying the surface issues in this case is the question whether a fugitive from justice can rely on his lawyer's advice given in connection with a decision to surrender voluntarily. The defendant placed his trust in an experienced Iowa trial lawyer who in turn trusted the Iowa law enforcement authorities to honor a commitment made during negotiations which led to the apprehension of a potentially dangerous person. Under any analysis, this was a critical stage of the proceeding in which the participation of an independent professional was of vital importance to the accused and to society. At this stage — as in countless others in which the law profoundly affects the life of the individual — the lawyer is the essential medium through which the demands and commitments of the sovereign are communicated to the citizen. If, in the long run, we are seriously concerned about the individual's effective representation by counsel, the State cannot be permitted to dishonor its promise to this lawyer."

In addition, it is obvious that individuals wrongly charged with crimes might be expeditiously cleared by the administration of polygraph examinations. However, given the psychological stress inherent in a polygraph examination, I cannot imagine a competent defense attorney allowing his client to take such an examination, if the State may blithely

ignore an agreement not to question the defendant out of counsel's presence. The majority might as well have commanded defense counsel to keep his cooperation with the State at an absolute minimum level. The majority has managed to fashion an opinion which serves the interests of no one. The opinion makes bad policy as well as bad law. I would reverse.

Judges Digges and Levine have authorized me to state that they concur with the views expressed herein.