# JOHN G. SIMKUS, JR. *v.* STATE OF MARYLAND

[No. 107, September Term, 1982.]

*Decided September 8, 1983.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Clarence W. Sharp, Assigned Public Defender,* for appellant.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom was *Stephen H. Sachs, Attorney General,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., concurs, and filed a concurring opinion at page 738 *infra.*

This is yet another of the cases involving hypnotically enhanced testimony which were argued on the same day. Because in this case we find that identification of the accused was made prior to hypnosis, we shall be obliged to address other issues. The convictions will be affirmed.

Appellant John G. Simkus, Jr., was convicted by a jury in the Circuit Court for Howard County of rape in the first and second degrees and theft under $300. The second degree rape conviction was held by the trial judge to have been merged into the first degree conviction. An appeal was entered to the Court of Special Appeals. We granted the petition of the State for a writ of certiorari prior to argument in the latter court that we might consider the issue relative to hypnosis with other such cases.

In addition to the issue of hypnotically enhanced testimony, we have here questions as to whether the trial court erred in denying Simkus' motion to suppress extra-judicial statements; in denying his motion to suppress in-court identification based on alleged impermissibly suggestive out-of-court photographic identifications; in admitting the testimony of Charles W. McCoy, an alleged participant with Simkus; and "in permitting the State to impeach Charles W. McCoy, its own witness." By Simkus' express direction we also have presented the issue of sufficiency of the evidence as to rape.

# I

Simkus and McCoy were both charged with the first degree murder of Debbie Napieralski. They were tried separately. McCoy was convicted of murder and theft.

Napieralski was last seen by her friend, Deborah Hurdel, after they had visited the Hidden Valley Country Club in Baltimore County and left there together on the early morning of February 15, 1981. Her body was discovered a week later in a field near Columbia in Howard County.

Near midnight on February 15 Mrs. Hurdel went to the Baltimore County Police with Miss Napieralski's father to

report the victim as missing. The police officer who took the report testified at the suppression hearing as to what he was told:

> "[E]arly that morning, early Sunday morning, the fifteenth, approximately at one forty, they went to Miss Hurdel's house, and Miss Napieralski advised Miss Hurdel that she was going to breakfast with two gentlemen, at which point, Miss Hurdel, or Miss Napieralski left the car there and left with the two gentlemen. I asked Miss — Miss Hurdel what the gentlemen looked like who they — who she left with, and she described them as follows: The first subject was described as a white male, twenty-five or twenty-six years old, approximately five eight, thin build, blonde hair and blonde mustache. The second gentleman was described as a white male, twenty-five or twenty-six years old, five seven, thin build, with short, curly blonde hair, wearing black rimmed glasses."

On February 19 Mrs. Hurdel was shown a photograph of a suspect named Ronnie Alder. She said that he looked similar to the person she had seen on the evening in question but she was not positive he was that individual, there being discrepancies between the photograph and the persons she had seen. She could add nothing to her prior description at that time. After Miss Napieralski's body was found, Mrs. Hurdel did supply a more detailed description. Testimony of the Howard County detective involved with the investigation was as follows as to his conversation with Mrs. Hurdel:

> "She described the driver of this vehicle as a white male with a dirty blond mustache, hair parted in the middle, the haircut was like collar length, approximately twenty-four years old, six foot tall, thin build, and she described the passenger that was in the vehicle as a white male about twenty-four years old, five foot eight, medium build, possibly wearing a long-sleeved insulated vest,

which was dark in color, wearing glasses, which were possibly brown or wire-framed, that he possibly had crooked front teeth, that he had dirty, curly hair, and he was cleanshaven."

A part of the record is a written statement by Mrs. Hurdel to the detective describing the suspects in detail. It and the detective's notes were filed in evidence in connection with the motion to suppress. Subsequently, on February 25, Mrs. Hurdel assisted a police artist in preparation of a sketch of both men.

On February 27 Mrs. Hurdel and Ronald Eyler, the doorman at the Hidden Valley Country Club, each were shown, separately, an array of seven photographs which contained Simkus' picture. Eyler wrote on the back of the one of Simkus, "[T]his is the guy is [sic] saw to [sic] Debbie Mapieralski [sic] Feb. 14, 1981." He then signed his name. She selected Simkus' photograph and told the officer, "This is the man I saw lean in the window and kiss the victim the night in question." She was then asked on a scale of one to ten to indicate how sure she was. She replied, "I'm an eight — no, I'm ninety per cent sure that's the man." She then wrote on the back of Simkus' photograph, above the writing of Eyler, "This is the man who followed Debbie Naperalski [sic] and my self [sic] from Hidden Valley." She then signed her name and the date of February 27, 1981.

On March 3 police met with Mrs. Hurdel and showed her a photographic array of seven pictures including one of McCoy. No positive identification was made. It was after this that Mrs. Hurdel was hypnotized by Dr. Daniel Stern, a Baltimore clinical psychologist.

The trial judge (Fischer, J.) who heard Simkus' motion to suppress the hypnotically induced testimony stated that he was required by *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978), to apply the standard enunciated in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923). He said in relevant part:

"While the experts agree that hypnosis is a reliable tool for memory retrieval, there is vast

disagreement in the scientific community with respect to the accuracy of the information obtained. A person under hypnosis may inadvertently distort or invent information and relay such memory with a belief that it is accurate. Obviously, a person suffering from these tendencies makes a most undesirable witness.

"This Court, however, does not believe that it necessarily follows, in light of the factual situation existing in this case, that Miss Hurdel's testimony must be excluded from the trial. It is clear to the Court that any evidence obtained through the use of hypnosis must be excluded. However, Miss Hurdel gave numerous statements prior to the hypnotic session and her recollection of the events given prior to the hypnosis is well documented. In view of this, the Court finds that she should be permitted to testify as to only those matters related by her in statements prior to the hypnosis and not to new information gained through hypnosis.

"The remaining issue is whether or not the testimony of the State's witness, Debra Hurdel, is admissible in light of the concern of the defense that their right of cross-examination has been impaired by the hypnosis."

The trial judge went on to discuss *State v. Mack,* 292 N.W.2d 764, 769-70 (Minn. 1980), which we also discussed at some length in *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983), the first of the cases involving hypnosis which we considered. He found *Mack* to be factually distinguishable in that there the hypnotic subject was the victim of the criminal sexual conduct, the hypnotically induced recollections were procured by an unqualified hypnotist with virtually no safeguards imposed, the victim had little independent recall of the incident because of an emotional block and use of alcohol, and "[t]he information adduced from the hypnotic session was not corroborated and was counter to the facts the

authorities had within their control." He pointed out that in this case Mrs. Hurdel "had significant independent recall that was verified and preserved by the five interviews and reports with the police. In addition, she had a session with a police artist for the purpose of compiling composite drawings and two photo identification sessions, all prior to the hypnotic session. Further, proper safeguards were imposed on the hypnotic session which was conducted by a qualified clinical psychologist."

Judge Fischer also referred to the guidelines laid down in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981), which we discussed in *Collins* as to evidence for which there was not a prehypnotic base. He concluded:

"A review of the content of the witness interviews and witness's statements prior to the hypnosis and the recorded hypnosis session shows that there is no material deviation. The hypnosis session added scant information with no discernable value. The Court finds that the witness's statements, police reports and composite drawings are sufficient to determine a recollection independent from the hypnosis, and, in any event, the State met its burden of clear and convincing evidence that the hypnotic session was not unnecessarily suggestive. It is the opinion of this Court that the State would be severely handicapped if Debra Hurdel could not testify that she was with the victim, Deborah Ann Napieralski, in the accompaniment of the defendants on the night of the victim's disappearance. The testimony of the witness, Debra Hurdel, will however be confined to testimony not hypnotically induced. Whatever slight prejudice the defendants might experience, all of which is speculation, must be outweighed by the extreme prejudice that would be experienced by the State if her testimony was excluded. It is clear that no information of probative value was obtained during the hypnotic session."

Simkus was arrested by Baltimore County Police at 2:40 p.m. on March 5, 1981. He was immediately turned over to officers from Howard County for transportation back to their headquarters. He was advised of his *Miranda* rights at 2:45 p.m. while in the police cruiser. He said that he did not wish to make a statement to the police. While en route to Howard County he asked the police to arrange to drop off keys to his vehicle to his mother. This was done. No other conversation took place. They arrived at the Howard County Police headquarters at approximately 3:15 p.m. He was processed for about thirty minutes and then placed in a holding cell. At the hearing on the motion to suppress he testified that at the time he was taken into custody he was advised that he "was under arrest for the murder of Deborah Napieralski." He was brought from the holding cell to an interview room at about 5:00 p.m. When the interview began one of the officers read a waiver of rights form under *Miranda v. Arizona*, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966), which Simkus signed. Then Simkus signed a waiver of prompt presentment. After he made some preliminary comments to Simkus relative to the ensuing procedures, a detective began taping an interview at 5:10 p.m. which lasted until 6:03 p.m. The interview resumed from 6:19 p.m. to 6:25 p.m. when Simkus said he had additions to make. He was furnished with paper and pen for preparation of a written statement. At 7:30 p.m. he was transported for presentation before a commissioner. A commissioner had been available prior to this time.

At trial the State presented the testimony of Charles W. McCoy. He had been convicted of the first degree murder of Miss Napieralski and of theft about two weeks earlier. The State had entered into an agreement with McCoy that in return for his testimony he would receive transactional immunity; the State would not use his testimony in any possible future trial; and at sentencing it would recommend that he be confined in Patuxent Institution, that he not be declared in violation of his parole, and that his theft sentence would run concurrently with his life sentence for

murder. On direct examination the State asked McCoy if he had "ever been convicted of any crimes." He replied, "In Seventy-Nine I was convicted of arson and about two weeks ago I was convicted of first degree murder."

We shall develop such additional facts as may be requisite as we discuss the various points raised.

## II

Simkus' first contention is that the trial court erred in denying his motions to suppress the identification and testimony of Debra Hurdel which, he says, "had been hypnotically restored or refreshed." We considered the whole matter of hypnotically enhanced testimony in *Collins*, 296 Md. 670. We concluded:

> "We see no reason why a person should not be permitted to testify in court in accord with statements which it clearly can be demonstrated he made prior to hypnosis. Such is not then hypnotically enhanced testimony. This seems to be in accord with the majority view. We do not go so far as to spell out the exact procedures which must be followed to clearly demonstrate that such statements were made prior to hypnosis. One method certainly might be to follow the guidelines laid down by the Arizona court in *[State ex rel.] Collins [v. Superior Court, etc.]*, 132 Ariz. 180, 210, [644 P.2d 1266 (1982),] which we have heretofore quoted. Since one cannot possibly envision all possible situations in which statements prior to hypnosis might be demonstrated to accord with posthypnotic testimony, we deem it wise not to attempt to spell out each and every condition or possibility for demonstrating reliability. To do otherwise is to risk omission of acceptable solutions which do not occur to us." 296 Md. at 702-03.

It is clearly demonstrated in this case that Mrs. Hurdel's identification of Simkus does not depend upon hypnosis. She gave a detailed description of him prior to hypnosis. This is in the record. She assisted in preparing a sketch of Simkus. This also was before hypnosis. She identified his photograph prior to hypnosis. Even if she had made no courtroom identification of Simkus her extra-judicial identification would have been admissible in evidence. *Bedford v. State,* 293 Md. 172, 177, 443 A.2d 78 (1982), and *Johnson v. State,* 237 Md. 283, 291, 206 A.2d 138 (1965).

When this case was tried the trial court and counsel did not have available what we have said in *Collins.* We believe the testimony of Mrs. Hurdel here was in accord with statements which it was clearly demonstrated she made prior to hypnosis. We point out, however, that an even safer procedure would have been to have had and introduced into evidence a video tape of what Mrs. Hurdel said on this subject prior to hypnosis. The trial judge's ruling was in accord with *Collins.*

### III

Simkus contends that his extra-judicial statement should have been suppressed because he was not promptly presented to a District Court commissioner as required by Maryland District Rule 723 a. That rule provides in relevant part:

"A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than 24 hours after arrest." [1]

---

1. This case was tried subsequent to July 1, 1981. On that date Code (1974, 1980 Repl. Vol., 1981 Cum. Supp.) § 10-912, Courts and Judicial Proceedings Article, became effective. It provides in its entirety:

"(a) *Confession not rendered inadmissible.* — A confession may not be excluded from evidence solely because the defendant was not taken before a judicial officer after arrest within any time period specified by the Maryland District Rules.

Simkus relies upon *Johnson v. State,* 282 Md. 314, 384 A.2d 709 (1978). At the time of *Johnson* M.D.R. 723 a stated:

"A defendant who is detained pursuant to an arrest shall be taken before a judicial officer without unnecessary delay and in no event later than the earlier of (1) 24 hours after arrest or (2) the first session of court after the defendant's arrest upon a warrant or, where an arrest has been made without a warrant, the first session of court after the charging document is filed. A charging document shall be filed promptly after arrest if not already filed."

In *Johnson* Judge Levine said for the Court:

"We ... hold that any statement, voluntary or otherwise, obtained from an arrestee during a period of unnecessary delay in producing him before a judicial officer, thereby violating M.D.R. 723 a, is subject to exclusion when offered into evidence against the defendant as part of the prosecution's case-in-chief. A statement is automatically excludible if, at the time it was obtained from the defendant, he had not been produced before a commissioner for his initial appearance within the earlier of 24 hours after arrest or the first session of court following arrest, irrespective of the reason for the delay. Where, however, the delay in presentment falls within the outer limits established by M.D.R. 723 a, it is incumbent upon the trial court to determine whether the State has met its burden of showing that the delay was necessary

---

"(b) *Effect of failure to comply strictly with Maryland District Rules.* — Failure to strictly comply with the provisions of the Maryland District Rules pertaining to taking a defendant before a judicial officer after arrest is only one factor, among others, to be considered by the court in deciding the voluntariness and admissibility of a confession."

In the view we take of this case it is not necessary for us to determine the extent, if any, to which this statute would be applicable to a crime arising prior to its effective date but tried subsequent to the effective date as here.

under the circumstances of the particular case. Examples of necessary delay might include those required: 1) to carry out reasonable routine administrative procedures such as recording, fingerprinting and photographing; 2) to determine whether a charging document should be issued accusing the arrestee of a crime; 3) to verify the commission of the crimes specified in the charging document; 4) to obtain information likely to be a significant aid in averting harm to persons or loss to property of substantial value; 5) to obtain relevant nontestimonial information likely to be significant in discovering the identity or location of other persons who may have been associated with the arrestee in the commission of the offense for which he was apprehended, or in preventing the loss, alteration or destruction of evidence relating to such crime." 282 Md. at 328-29.

Simkus focuses on the period between 3:15 p.m. and 5:00 p.m. at which time he signed a waiver of prompt presentment, a procedure which we sanctioned in *Logan v. State,* 289 Md. 460, 425 A.2d 632 (1981). Simkus alleges that none of the examples set forth in *Johnson* cover the situation here and that the only reason for delay in presenting him to a commissioner after 5:00 p.m. on March 5 was to interrogate him in derogation of the requirement of the rule. He cannot get around the fact, however, that after 5:00 p.m. he waived prompt presentment. He says of this waiver:

"While the waiver of prompt appearance form signed by Appellant and the advice given to him by Sgt. Schlossnagle fully advised Appellant of the information he would receive from the judicial officer at his initial appearance, it failed to advise him of the offense with which he was charged, nor was Appellant told that he could terminate the interrogation at any time and if he did so he would be taken before a judicial officer without delay. His waiver under *Logan* was not knowingly, intelli-

> gently, and voluntarily made, and it was therefore ineffective to cure the period of unnecessary delay, which, in fact, was nothing more than a device by the police to continue and obtain the statement from him which they felt was important to their case."

It is clear from Simkus' own testimony, which we have previously quoted, that he was advised of the nature of the charge against him at the time he was arrested.

At the suppression hearing Sgt. Schlossnagle testified that he told Simkus prior to interrogation:

> "Briefly, I told him again who I was, advised him where he was at specifically, meaning Howard County police headquarters in Ellicott City, told him that he would be going to a Commissioner's for a bond review, or for a bail hearing, told him that we had interviewed Mr. McCoy. I told him that I was going to advise him of his *Miranda* rights on tape, if he wished to make a statement, and also briefly explained the *Johnson* rights to him. And then Detective Witte came into the interview room and the tape recorder was turned on, and the rights were read to him at that time."

There was introduced into evidence the form signed by Simkus which included advice that he had an absolute right to remain silent; that if he chose to answer, his answers could be used against him in court; that he had the right to a lawyer; that if he wanted a lawyer and could not afford one one would be provided for him; that he had the right to talk privately with his lawyer before answering any questions and to have the lawyer with him during the questioning; and that if he elected to answer questions without having a lawyer present that he had a right to stop at any time and obtain the service of a lawyer. There also was introduced the second form which he signed. This stated that he had the right to be presented to a judicial officer at any time; that the judicial officer is required to provide him with a copy of the charging

document, if one has not already been so provided, and to inform him of each offense with which he was charged; that the judicial officer is required to advise him of his right to counsel; that the judicial officer is required to make a pre-trial release determination and is required to determine whether or not there is probable cause to believe that he committed an offense; and that the judicial officer is required to advise him of his right to a preliminary hearing, if appropriate, and to notify him of the trial date, or advise that such notification will be made by the clerk. The officer testified:

> "Mr. Simkus then read the next paragraph, which states, 'The above rights were read to me, and I understand them. I am willing to delay my initial appearance before a judicial officer. I understand and know what I am doing. No promises or threats have been used against me. I waive my right to prompt presentment before a judicial officer.' The defendant then signed this form. There was some explanation as I read this form to him, to make sure he understood it, such as I, I referred to a judicial officer as the Commissioner."

At the hearing on the motion to suppress it was not claimed that the *Johnson* waiver was not executed in a knowing and voluntary fashion. Simkus was asked, "Do you know what the *Johnson* waiver is? And how was the *Johnson* waiver explained to you?" He replied:

> "The way it was explained to me that they told me that normally they'd take me to a Court Commissioner, but in order for me to talk to them — after, this is after I had agreed to give them a statement — they told me that normally they'd have to take me to the Commissioner's, but this was, this form was to delay it so I could give them a statement."

He testified that this form was signed only after he had already agreed to give them a statement.

We find no error in denying Simkus' motion on the basis of prompt presentment.

## IV

It is claimed that Simkus did not knowingly and intelligently waive his right to counsel. He says that he made repeated requests to make telephone calls which were denied and that the police told him that they did not have time to wait for his attorney before beginning their interview.

As Chief Judge Brune observed for the Court in *McDowell v. State,* 231 Md. 205, 211, 189 A.2d 611 (1963), "The credibility of witnesses is primarily for the determination of the trier of facts. *McKenzie v. State,* 230 Md. 513, 514, 187 A.2d 885 [(1963)]." *Accord, Watson v. State,* 282 Md. 73, 78, 382 A.2d 574 (1978), and *Cunningham v. State,* 247 Md. 404, 417, 231 A.2d 501 (1967), *cert. denied,* 390 U.S. 908 (1968). Moreover, under Rule 886 "the judgment of the lower court will not be set aside on the evidence unless clearly erroneous . . . ." Accordingly, what the trial judge said here in ruling on Simkus' motion to suppress is significant:

"But what it all boils down to, what it all boils down to on these motions is who you're going to believe, and take in the totality of all the circumstances. And I have taken in the totality of all the circumstances, and I have weighed and considered, point by point, part by part, and there's no question in my mind, because I don't see any inconsistency on the part of the State, but I see much on the part of the defendant, who has all to gain and nothing to lose by lying. And there has been inconsistencies on this [sic] part, and I frankly don't believe, I don't believe when the [sic] said he asked to make phone calls and was not granted that right. I just don't believe it. I don't believe him when he said he was chained, when the officer said he was not, that they left the room when the man was not even chained. And it's

all in the record. It's as plain as could be to me, and there's no question in my mind that I can in good conscience deny the defendant's motion."

We find no error.

## V

It is claimed the trial court erred in denying Simkus' motion to suppress in-court identification "based on the impermissibly suggestive out-of-court photographic identifications."

Mrs. Hurdel testified that she was with the victim when two people approached them outside the parking lot of the Hidden Valley Country Club. She said that they talked with the men for approximately five minutes. She was three or four feet away from Simkus, who was speaking to the victim. She said the parking lot "was pretty well lit because all the car lights were on because people were leaving." There was a second opportunity for observation. This took place in the driveway of a house in Hurdel's neighborhood. She said she was sitting on the passenger's side of the car when Simkus approached the driver's side and looked in the widow to talk with the victim who was sitting in the driver's seat. At that scene she said, "It was pretty well lit up and the people that owned the home had a light on."

As previously indicated, Mrs. Hurdel assisted a police artist in composing sketches of the two men who were last seen with the victim on February 15. The sketches were shown to Eyler on February 26. When he said he recognized them as two men who had visited the Hidden Valley Country Club on previous occasions the police returned with a photographic array which included Simkus. Eyler selected Simkus' photograph from the array. It is claimed "that the procedure of showing the single sketch to Eyler and showing the photographic array to Hurdel after she had assisted in composing the sketch was similar to the procedure branded as unnecessarily suggestive in *Rustin v. State,* 46 Md. App. 28 (1980); and *Manson v. Brathwaite,* [432 U.S. 98, 97 S. Ct. 2243, 53 L. Ed. 2d 140 (1977)]."

In *Rustin* the only person able to identify the defendant at trial was a detective who had viewed the suspect at the crime scene for only five to ten seconds. The detective arrested the defendant's brother two hours after the robbery. Three days later the detective was informed by other police officers that he had arrested the wrong individual and that the defendant was the perpetrator. The detective obtained a photograph of the defendant to examine. He also obtained information from FBI records which he checked which revealed that the defendant's prior record was more extensive than that of the person whom he had originally arrested. The detective then went on to find the defendant. He spent approximately two hours with him in a one-on-one situation. The Court of Special Appeals found that the suggestiveness resulting from this procedure outweighed any aspects of reliability present in the identification. The court utilized the reliability factors set out in *Neil v. Biggers,* 409 U.S. 188, 93 S. Ct. 375, 34 L. Ed. 2d 401 (1972), and reiterated in *Manson:*

> " '[T]he opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of his prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation. Against these factors is to be weighed the corrupting effect of the suggestive identification itself.' " 46 Md. App. at 32-33, quoting from 432 U.S. at 114.

As to Eyler, the sketch could hardly have been suggestive when he was unable to say who either individual was other than that they had visited Hidden Valley Country Club. As to Mrs. Hurdel, the extreme suggestiveness present in *Rustin* is simply not present in this case. In fact, the trial judge said:

> "And it is my honest opinion, my fair and honest opinion, that taking everything in its totality, with an array that I think could not be closer to the subject in identity or, or whatever you may call it,

five or six youths, blond hair, and about the same features and whatnot, I don't know how you could get a more fair array, the whole thing smacks of fairness. I saw no suggestiveness, although Mr. Sacks [, counsel for Simkus,] tried to confuse Mr. Eyler, who, in my opinion, could very easily be confused, it wouldn't take much. And as far as Miss . . . Hurdel, she called it as she saw it. Now, it's true that there was a writing on the back of the card that identified the defendant. But that was after the fact, not before, but after, when the identity was made, and nothing unfair about that, taking everything in its totality. You'd better come up with something better than you've had so far, Mr. Sacks, because I find absolutely nothing wrong with it."

It is important to note that Eyler knew Simkus. He said he knew him "when he come to Hidden Valley before all this took place."

The evidence supports the trial court's holding that the identifications were clearly reliable and any in-court identifications were not the product of any suggestiveness.

## VI

Simkus claims the court erred in admitting the testimony of McCoy. As he puts it:

"Midway through trial the State offered as its witness Charles W. McCoy, who had been convicted of the first-degree murder of Debbie Napieralski and the theft of her property on October 9, 1981. McCoy had remained silent at his trial, but the State had introduced his taped and written statements to the police in which he had admitted (after first denying complicity) that he had strangled Napieralski and had then driven the car over her body. After his conviction he apparently 'recanted,' approached the State, and offered to tes-

tify against Appellant in return for an agreement that he would receive transactional immunity, his testimony would not be used against him in any possible future trial, and that at his sentencing the State would recommend his confinement in Patuxent, his sentence for theft would run concurrently with the life sentence, and any parole violation in Baltimore City not be pressed. The trial court admitted McCoy's testimony, and he then stated that it was Appellant who had, in fact, forced Napieralski to have sex with both of them and that Appellant then strangled her and drove the car over her body."

Simkus complains that the State should have requested the court to call McCoy as its own witness as in *Patterson v. State,* 275 Md. 563, 342 A.2d 660 (1975). Judge O'Donnell commented for the Court in that case, "Although the procedure has been most frequently invoked in those cases where a party will not vouch for the veracity and integrity of a witness, the discretionary right vested in a trial court to call a person as the court's witness is clearly not limited to such circumstances." *Id.* at 575. There is no contention here that the State knowingly used false or perjured testimony by calling McCoy to the stand. Simkus admits that the State went to great lengths to place the full facts before the jury both with respect to the agreement under which McCoy was testifying and the prior statement that he had given to the police. The contention seems to be that McCoy's testimony was so suspect in light of his contradiction of his prior confessions that it should not have been admitted under the sponsorship of the State.

Aside from any other reason, the short answer to the contentions of Simkus is that the point was not raised below. In the trial court, counsel for Simkus said, "I renew our objection to the testimony generally and that's the fact that it was given to me at the eleventh hour in which I made the objection earlier in the week." The objection "earlier in the week" was based on the late disclosure of the fact that McCoy would

testify (although he had been listed right along as a potential witness) and the fact that the defense did not have a copy of what he would say. Arrangements were made to provide the latter.

It is a bit unusual for there to be an objection made on behalf of the defendant that the State should have requested the court to call a witness rather than the State's calling him. Objections are usually the other way. Be that as it may, however, the point not having been preserved for appeal, it is not before us. Rule 885 and *von Lusch v. State,* 279 Md. 255, 262-63, 368 A.2d 468 (1977).

## VII

It is claimed the trial court erred "in permitting the State to impeach Charles W. McCoy, its own witness." This refers to the fact that, over objection, the State was permitted to ask McCoy if he had ever been convicted of a prior crime. As we have previously indicated, he replied in the affirmative, listing his two convictions.

We do not see this as impeachment under the circumstances, but the conduct of skilled trial counsel who recognized the importance of laying squarely before the trier of fact any weakness in his own case.

## VIII

At the express request of Simkus it is contended that the evidence presented was not sufficient to support his conviction of first and second degree rape. We have carefully reviewed the record and conclude that it was.

*Judgment affirmed; appellant to pay the costs.*

*Murphy, C. J., concurring:*

I am in full agreement with the Court's opinion except as to Part II, as to which I concur only in the result for reasons expressed in my dissent in *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983).