# STATE OF MARYLAND v. LAWRENCE WILLIAM METSCHER

[No. 106, September Term, 1982.]

*Decided September 8, 1983.*

*Per Curiam on Motion For Reconsideration filed October 24, 1983.*

*Motion for reconsideration filed by appellant on October 4, 1983; motion denied on October 24, 1983. See per curiam filed on October 24, 1983, at page 375 infra.*

The cause was argued before MURPHY, C. J., and SMITH, ELDRIDGE, COLE, DAVIDSON, RODOWSKY and COUCH, JJ.

*Richard B. Rosenblatt, Assistant Attorney General,* with whom were *Stephen H. Sachs, Attorney General,* and *Ann E. Singleton, Assistant Attorney General,* on the brief, for appellant.

*Arthur A. DeLano, Jr., Assistant Public Defender,* with whom was *Alan H. Murrell, Public Defender,* on the brief, for appellee.

SMITH, J., delivered the opinion of the Court. MURPHY, C. J., dissents, and filed a dissenting opinion at page 375 *infra.* Per Curiam on Motion For Reconsideration at page 375 *infra.*

This is yet another of the cases involving hypnotically enhanced testimony which were argued the same day. We shall affirm the judgment of the Court of Special Appeals here. It, in an unreported opinion, reversed the conviction of Lawrence William Metscher and remanded the case for a new trial.

Metscher was convicted by a Montgomery County jury of first degree sexual offense and assault with intent to maim. Prior to trial he filed a motion to suppress evidence pertaining to testimony from the victim. He contended that the evidence was inadmissible because she was subjected to hypnosis prior to her testimony. The trial court denied the motion, holding that none of the evidence was the product of hypnosis. Our recitation of facts, except for the professional qualifications of the psychologists, is gleaned from a statement of facts to which the parties agreed pursuant to Maryland Rule 828 g.

I

At approximately 2:00 a.m. while driving to the home of a friend the victim heard a thud against her car. Thinking she had struck something, she got out of the car. She found a man lying in the road. When she got close to him, he grabbed her by the hair and dragged her into the woods. At

knife point he forced her to perform fellatio. He sawed her breasts with his knife and otherwise threatened her. Her assailant ran off when he was startled by a passing car. She then ran to a nearby home where she called police. She described her attacker as a white male in his early 20's, five feet seven inches tall, with several days growth of beard and a mustache, wearing a black or dark T-shirt and jeans, and armed with a knife.

About an hour later Metscher was arrested as he came out of the woods less than a mile from the scene of the attack. He fit the description the victim had given, including the fact that he was carrying a knife. K-9 units were able to track a scent leading from the scene of the attack to the house where the victim called police. They were also able to track another scent leading from the scene of the attack to the place where Metscher was apprehended.

Immediately upon his apprehension Metscher was taken for a one-on-one showup for the victim to attempt to identify him. She was in an extremely upset condition and asked to be taken to a hospital for treatment instead. However, she did finally agree to the showup. Friends virtually had to carry her out of the house. She cried hysterically. As to whether Metscher was her assailant, she said, "I can't be sure. It was dark. I don't know."

One or two days after the incident the victim notified police that Metscher was her assailant, saying that the reason she had not identified him earlier was because she was so upset and physically afraid of Metscher. She said if a lineup were arranged she could pick him out. On the advice of the State's attorney's office a lineup was not arranged.

As time passed the State's attorney and police became concerned that the victim was experiencing additional anxiety and having increasing difficulty in recalling what she had originally told the police. In an effort to solve that problem she was hypnotized by an officer of the Montgomery County Police Department who had been trained in hypnotism. Also present at the hypnotic session was a member of the Maryland State Police who had been involved with hyp-

nosis for the previous two years and who was trained by Dr. Daniel Stern of the Investigative Hypnosis Institute. A tape recording of the hypnotic session was made. Unfortunately, thirty minutes of the tape has been erased inadvertently.

The victim identified Metscher as her assailant at the hearing to suppress her identification of Metscher because of the hypnosis. She said she had studied his features very carefully during the incident and that she was able to see fairly well because there had been a full moon on the night in question.

The victim was questioned at the suppression hearing relative to the hypnotic session. In response to a question as to whether her memory was better after that session she said:

> "Was my memory better? I would not say it had anything to do with my memory at all.
>
> "The best thing I got out of the entire hypnosis was finally — I had never actually repeated the story to anyone in that kind of detail since the night of the incident and my first meeting with Mr. Ceppos [, an assistant State's attorney]. It was a great relief. It was just a feeling of relief. It was not a feeling that I had remembered any more or any less than before.
>
> "In fact, I still could not imagine what anyone was looking for that I had not already recalled or already known."

Subsequent to that hearing she addressed a letter to the Chief of the Montgomery County Police Department in which she said in part:

> "On Friday evening, September 26, 1980, I met with Lt. Robey and Sgt. White (Md. State Police) who conducted the procedure. Although the main goal of hypnosis is to help the victim remember specific details with reference to the case, both gentlemen showed the utmost concern for my

> well-being. They assured me that at no time would
> I 'lose control' while under hypnosis, and I can
> assure you that through their proficiency we
> obtained good results. Through hypnosis I was able
> to recall specific, step-by-step details of the assault,
> and clearly and positively identify the defendant."

Testimony was adduced at the suppression hearing from two licensed clinical psychologists. One, Dr. Melvin Gravitz, produced by Metscher, helped formulate hypnosis guidelines for the Federal Bureau of Investigation. He is a Diplomate in Clinical Psychology, Forensic Psychology, Clinical Hypnosis, and Experimental Hypnosis by certification of the appropriate boards. Dr. Gravitz has been in the full-time independent practice of psychotherapy and clinical hypnosis since 1964. He currently is a consultant to the U.S. Department of State, the Walter Reed Army Medical Center, and the National Naval Medical Center. Dr. Gravitz believed that one or more suggestive statements was made to the victim by the hypnotist (e.g., "Everything is secure in your memory."). He regards hypnosis as a proper investigative tool if strict guidelines are followed, such as those used by the FBI or those laid down in *State v. Hurd,* 86 N.J. 525, 432 A.2d 86 (1981). He is of the view that everyone confabulates in relating something, whether under hypnosis or not. He said there was no way of knowing whether the victim's perception was any different under hypnosis.

The State called Dr. Daniel Stern, a clinical psychologist, stipulated by the parties to be an expert in the field. He has been Director of the Investigative Hypnosis Institute since 1979, Director of Psychological Service at North Charles General Hospital since 1974, and Assistant Professor of Psychology at Loyola College since 1975. He was of the view that confabulation was unlikely in the subject hypnotic session because on several occasions the victim told the hypnotist that she could not remember certain things. He explained that this was an exercise of her critical judgment, demonstrating her ability to make a distinction between what she perceived and any suggestion others might give

her. He concluded as a consequence that she had been able to maintain her own judgment. Dr. Stern noted a tremendous similarity between the victim's statement to police and her statements under hypnosis. He believed the session to have been conducted within approved standards and that nothing was unnecessarily suggestive. He stated that there is no scientific evidence that confabulation is more likely under hypnosis than under any other technique for interviewing. He did not believe that the fact that the hypnosis session took place in a police station rendered it any more suggestive than in some other setting. He saw no evidence that hypnosis altered the victim's statement or recollection in any way.

The trial judge denied the motion to suppress, saying in pertinent part:

"[R]eally the hypnosis is a non-issue in this case because the facts show that even if she was placed in a suggestible state, no suggestion was made, and it shows that she already had an inclination to do what she did.

"I am satisfied and find that the real thing the hypnosis did was put her into a relaxed state so she is comfortable in talking to somebody about what was a horrible incident for her that evening."

The Court of Special Appeals reversed, stating:

"While her testimony does, in part, support the trial court's ruling, it came *after* the hypnosis and is not a reliable gauge of her pre-hypnosis recall. Additionally, the tape recording of the session has an approximate thirty minute gap where it was inadvertently erased.

"Although there was testimony as to what occurred during that 'gap,' it is impossible to ascertain with any certainty what verbal suggestions, if any, may have been made directly or inadvertently to the subject, just as it is impossible to ascertain from any tape recording what *non-verbal* sug-

gestions, if any, directly or inadvertently, may have influenced a subject.

"Since the identification *may* have been the product of hypnosis, we follow *Collins v. State,* [52] Md. App. [186, 447 A.2d 1272 (1982)], and reverse." (Emphasis in original.)

*Collins v. State,* 52 Md. App. 186, 447 A.2d 1272 (1982), to which the Court of Special Appeals alluded, is one of the cases on the subject of hypnosis argued the same day as this case. We granted Metscher's petition for a writ of certiorari in order that we might address the important issue here presented.

## II

In *State v. Collins,* 296 Md. 670, 464 A.2d 1028 (1983), argued the same day this case was argued, we considered the matter of hypnotically enhanced testimony. In a situation where a witness has been hypnotized we adopted as a basis for evaluation the Frye-Reed test laid down in *Frye v. United States,* 293 F. 1013 (D.C. Cir. 1923), and adopted by this Court in *Reed v. State,* 283 Md. 374, 391 A.2d 364 (1978). We stated that we saw no reason why a person should not be permitted to testify in court in accordance with statements which it clearly can be demonstrated he made prior to hypnosis, since such is not then hypnotically enhanced testimony. We required demonstration that such statements were made prior to hypnosis. Since we believed that there could be acceptable solutions which might not occur to us, we declined to spell out the exact method which might be used to demonstrate the reliability of pre-hypnotic testimony. We suggested that one method to establish reliability might be to follow the guidelines laid down in *State ex rel. Collins v. Superior Court, etc.,* 132 Ariz. 180, 210, 644 P.2d 1266 (1982). In this case we have no demonstration that the testimony is in accordance with statements made prior to hypnosis. Hence, the Court of Special Appeals

correctly determined that the judgment of the trial court must be reversed and the case remanded for a new trial.

*Judgment affirmed; Montgomery County to pay the costs.*

*Murphy, C. J., dissenting:*

I decline to join in the Court's opinion for the reasons stated in my dissent in *Collins.* Moreover, the rule laid down by the majority in that case — that hypnosis enhanced testimony is *per se* inadmissible unless the recollections forming the substance of the testimony are clearly demonstrated to have existed before the hypnosis — does not fit well with the facts present in this case. The evidence at trial showed that the victim's version of the criminal episode did not change as a result of hypnosis. She gave a detailed description of the crime and of her assailant, as well as an easily appreciated reason why she declined initially to identify the defendant, all prior to any use of hypnosis. Although the Court need not at this time establish rigid guidelines to govern all cases, the absence of a guiding rationale for development of the rule will no doubt result in other cases of this sort, where all evidence points to consistent pre- and post-hypnotic recollections, yet the Court can find no "clear demonstration" of pre-hypnotic recollection.

## ON MOTION FOR RECONSIDERATION

PER CURIAM:

The State has filed a motion for reconsideration which we shall deny.

The State asks that if its motion for reconsideration is denied, it should nevertheless be permitted the opportunity

upon remand to demonstrate to the trial court that the testimony of the victim was in accord with pre-hypnotic statements. We believe the State should have that opportunity.

*Motion for reconsideration denied.*