484 A.2d 624

**Charles William McCOY**

v.

**STATE of Maryland.**

**No. 67, Sept. Term, 1984.**

Court of Appeals of Maryland.

Dec. 10, 1984.

■■■■■■■■■■

Arthur A. DeLano, Jr., Asst. Public Defender, Baltimore (Alan H. Murrell, Public Defender, Baltimore, on the brief), for appellant.

Richard B. Rosenblatt, Asst. Atty. Gen., Baltimore (Stephen H. Sachs, Atty. Gen., Baltimore, on the brief), for appellee.

Argued before MURPHY, C.J., SMITH, ELDRIDGE, COLE, RODOWSKY and COUCH, JJ., and EDWARD D. HIGINBOTHOM, Associate Judge of the Third Judicial Circuit (retired), Specially Assigned.

SMITH, Judge.

This is yet another case involving hypnotically enhanced testimony. See *State v. Collins*, 296 Md. 670, 464 A.2d 1028 (1983), for our leading case on the subject, and *Simkus v. State*, 296 Md. 718, 464 A.2d 1055 (1983), for an application of *Collins* to the co-defendant of Charles William McCoy, the appellant in this case. Other applications of *Collins* are found in *Calhoun v. State*, 297 Md. 563, 574–78, 468 A.2d 45, 49–51 (1983), *cert. denied*, —— U.S. ——, 104 S.Ct. 2374, 80 L.Ed.2d 846 (1984); *State v. Metscher*, 297 Md. 368, 464 A.2d 1052 (1983), and *Grimes v. State*, 297 Md. 1, 464 A.2d 1065 (1983). We shall hold that, as in *Simkus*, there was sufficient evidence of a prehypnotic base for the testimony in question to permit its admission.

I

At issue here is the identification of McCoy at trial by Deborah Hurdel over the defendant's objection. She had been hypnotized previously. The judge who heard the motion to suppress specified that her testimony would "be confined to testimony not hypnotically induced." The record shows:

"Q.  Okay.  Ms. Hurdel, I'm going to ask you a series of questions, and I'd like you to recall now only what you

knew prior to that day that you met Dr. Stern on March 3rd, 1981. Do you understand that?

"A. I think so."

This was followed by an objection and the ruling of the judge presiding at trial based upon the ruling of the judge who had heard the motion to suppress. He specified that counsel should ask questions based only on what was recalled prior to hypnosis.

McCoy was convicted by a Howard County jury of murder in the first degree. The Court of Special Appeals reversed the conviction in an unreported opinion. It held "that it was error to have admitted into evidence the testimonial identification by Mrs. Hurdel." We granted the State's petition for a writ of certiorari and ordered "that the case be remanded to the Court of Special Appeals of Maryland for reconsideration in light of *State v. Collins,* [296 Md. 670, 464 A.2d 1028 (1983) ]." *State v. McCoy,* 297 Md. 5, 464 A.2d 1067 (1983).

On remand the Court of Special Appeals reviewed the evidence before the trial judge on the motion to suppress. It affirmed the conviction in an unreported opinion. That court referred to our opinion in *Collins,* 296 Md. 670, 464 A.2d 1028, where we said:

"We see no reason why a person should not be permitted to testify in court in accord with statements which it clearly can be demonstrated he made prior to hypnosis. Such is not then hypnotically enhanced testimony. This seems to be in accord with the majority view. We do not go so far as to spell out the exact procedures which must be followed to clearly demonstrate that such statements were made prior to hypnosis. One method certainly might be to follow the guidelines laid down by the Arizona court in *[State ex rel.] Collins [v. Superior Court, etc.],* 132 Ariz. 180, 210, [644 P.2d 1266 (1982),] which we have heretofore quoted. Since one cannot possibly envision all possible situations in which statements prior to hypnosis might be demonstrated to accord with posthyp-

notic testimony, we deem it wise not to attempt to spell out each and every condition or possibility for demonstrating reliability. To do otherwise is to risk omission of acceptable solutions which do not occur to us." 296 Md. at 702–03, 464 A.2d at 1044–45.

The Court of Special Appeals went on to say:

"The appellant in *Simkus v. State, supra,* was a co-defendant of the appellant, McCoy, although he was tried separately and convicted of the murder of Ms. Napieralski. Simkus appealed to this Court and the Court of Appeals granted certiorari prior to argument in this Court. In affirming Simkus' conviction the Court of Appeals said:

' "It is clearly demonstrated in this case that Mrs. Hurdel's identification of Simkus does not depend upon hypnosis.

\*    \*    \*    \*    \*    \*

The trial judge's ruling was in accord with *Collins.*" '

"Since the evidence adduced at McCoy's trial was substantially identical to that adduced at Simkus' trial, we are compelled to conclude that it was clearly demonstrated in McCoy's trial that Mrs. Hurdel's identification of McCoy does not depend upon hypnosis. The trial judge's ruling admitting her testimony was in accord with *State v. Collins, supra.*"

We granted McCoy's petition for a writ of certiorari.

## II

Background is provided in a portion of the agreed statement of facts which the parties have entered into pursuant to Maryland Rule 828 g:

"On February 15, 1981, Debbie Hurdel came to the Woodlawn Police Station in Baltimore County to report that her friend, Debbie Napieralski, was missing. Hurdel told the police that she and Napieralski had been approached by two men as they were leaving the Hidden Valley Country Club at approximately 1:45 a.m. One

man came up to Napieralski and said: 'Hey, where's my valentine's kiss?' Napieralski gave him a kiss. The other man came up to Hurdel and asked her if they wanted to go to breakfast. Hurdel declined, but Napieralski agreed 'to go to breakfast with them.' The two men then followed Hurdel and Napieralski to Hurdel's house. Before leaving with the two men, Napieralski told Hurdel that 'if my mother calls in the morning, just tell her I'm sleeping.' "

Officer Schaeffer of the Baltimore County Police Department testified at the suppression hearing that the descriptions given by Mrs. Hurdel to him on the morning of February 15 were as follows:

"The first subject was described as a white male, twenty-five or twenty-six years old, approximately five eight, thin build, blonde hair and blonde mustache. The second gentleman was described as a white male, twenty-five or twenty-six years old, five seven, thin build, with short, curly blonde hair, wearing black rimmed glasses." [1]

Admitted into evidence at the suppression hearing was a copy of the report written by Officer Schaeffer on February 15, 1981, which contained these descriptions.

At the request of a friend of the family, Officer Hamel of the Baltimore County Police Department became involved, while off duty, in investigation into the disappearance of Deborah Napieralski. He talked to Mrs. Hurdel by telephone on February 17, 1981. He testified as to the description given to him:

"A. She said one of the subjects had dirty blond hair and a mustache, with the hair parted in the middle and further back, in his twenties, approximately between twenty-four and twenty-five years. The second subject had curly tight dirty blonde hair with black rimmed glasses rounded at the bottom with thick frames, and looked goofy, in her words, and had real crooked teeth."

---

1. The second individual is said to be McCoy.

"Q. Okay, did she indicate what race these people were?

"A. Both were white males."

Introduced as evidence were his notes of the telephone conversation. As to one individual the notes state:

"Dirty blonde curly hair

Thick blk rim glasses

Lt. colored pants

Clean shaven [-] 20's

Looked crazy & goofy [-] crooked teeth"

As to the other individual the notes reflect:

"Parted in middle dirty blond

Feathered back

5.8/5-9 [-] Thin—20's

Mustache no beard"

Officer Hamel submitted a written report of his telephone conversation, admitted into evidence, in which the descriptions appear as follows:

"Hurdel described subject # 1 as:

"A white male with dirty blonde hair which was parted in the middle and feathered back. Also a light mustache. 5'07" to 5'08" very thin approx 24 to 25 yrs. No further description.

"Subject # 2:

"A white male with dirty blonde hair which was a tight curle [sic] wearing glasses. Shorter than the first subject. Thin build. Goofy looking approx 22 yr of age."

On February 18 Officer Hamel spoke with Hurdel at her home. He again had her describe the two men. His notes, which were admitted into evidence, read:

"Subject # 1: Dirty blonde hair & mustache parted in middle feathered back 5-07 to 5-8 very thin approx 24-25 yrs.

"# 2: Curly tight dirty blonde hair black rim rounded at bottom thick frame. Looked goofy. Approx 23 yrs.

old thin build shorter than first subject light tan cordory [sic] pants real crooked teeth."

On February 19 Officer Hamel and Officer Collins showed Hurdel a photograph of Ronnie Alder. It was a single photo, not in an array. Officer Hamel testified:

"Q. Okay, and was any identification made of that photo?

"A. Debbie Hurdel said that the subject looked similar to the one that she had seen that evening, but she wasn't positive it was the same.

"Q. Did she indicate any discrepancies with that photo and the person she had seen?

"A. The hair was different, yes."

Officer O'Brian, assigned to the plain clothes street crimes unit at the Woodlawn Station of the Baltimore County Police, interviewed Mrs. Hurdel on February 18 and again on February 22. On the latter occasion he visited the Hurdel residence to notify her of the discovery of Napieralski's body. He took a written statement from Mrs. Hurdel at that time which statement was admitted into evidence. The descriptions contained in it are:

"# 1—W/m, tall, thin, about 5/10–6/00, blondish hair with some brown, style back, about collar length, 23/24 yrs., slight acne below sideburns & lower jaw, I'm pretty sure he had a mustache.

"# 2—W/m, 5/08, 23/24 yrs., thin, no mustache, curly blondish hair, wide nose, glasses, poss. wire frame, (not sure), he acted weird. Poss. wearing an unk [sic] nylon quilted type jacket."

After Napieralski's body was found in a corn field near Columbia in Howard County, the investigation was turned over to Detective Richard Witte of the Howard County Police Department. He testified as to the description she supplied of the two individuals:

"She described the driver of this vehicle as a white male with a dirty blond mustache, hair parted in the middle, the haircut was like collar length, approximately

twenty-four years old, six foot tall, thin build, and she described the passenger that was in the vehicle as a white male about twenty-four years old, five foot eight, medium build, possibly wearing a long-sleeved insulated vest, which was dark in color, wearing glasses, which were possibly brown or wire-framed, that he possibly had crooked front teeth, that he had dirty, curly hair, and he was clean-shaven."

Detective Witte's original notes as to this interview were introduced into evidence and are consistent with his testimony.

On February 25, 1981, the Howard County Police acquired the services of Detective Rolf J. Wysock, a composite sketch artist with the Delaware State Police. He met with Hurdel on that day for the purpose of preparing a composite sketch of the two individuals. Prior to preparing the sketch Wysock took a description from Hurdel which was incorporated into his "composite sketch report." It shows:

| "COMPOSITE DRAWING NUMBER | #150-20-81 | #150-21-81 |
|---|---|---|
| DESCRIPTION OF SUBJ(S) | SUBJ. NO. 1 | SUBJ. NO. 2 |
| COLOR/SEX | WM | WM |
| AGE | 22-25 | 22-26 |
| HEIGHT | 5'9"-6'0" | 5'8" |
| BUILD | Thin | Med |
| WEIGHT | ? | |
| HAIR/LENGTH | Dirty blond/ below ears | Light brown/ below ears |
| COMPLEXION | Fair | Pale |
| SCARS/MARKS/DEFORM. | Acne | Unk |
| EYES | ? | Light |
| BEARD/MUSTACHE | Mustache | Clean shaven |
| OUTSTANDING/UNUSUAL FEATURES ETC. | Stringy hair | Curley [sic] hair |
| CLOTHING | | |
| MISC. INFORMATION | | |
| MOST RECOG. FEATURES" | | |

Upon completion of the sketches she was asked to give a rating as to accuracy. As to the first drawing, later identified as Simkus, the officer testified that "she gave it between an eight and a half to a nine."

Wysock testified as to Hurdel's description of the second individual (McCoy):

"The second subject as a white male between the ages of twenty-two to twenty-six; five feet eight inches; medium build; light brown hair, below the ears; complexion, pale; she does not recall seeing any scars, marks or deformities; eyes, light; beard or mustache, clean-shaven; outstanding features would be curly hair."

As to his sketch of that individual Wysock testified that he "asked her to rate it on a scale from one through ten, and she gave it between a nine and a half and a ten."

On February 27 Hurdel made a photographic identification of Simkus as the driver of the car.

On March 3 Hurdel was shown an array of seven photographs including one taken two years before of McCoy. The transcript relative to Detective Witte's testimony on that subject reflects:

"Q. Was Miss Hurdel able to make an identification from that array that you showed her March third, 1981?

"A. She did not identify Mr. McCoy.

"Q. Did she make any positive identification of anyone involved in the array?

"A. No positive identification, no, ma'am.

"Q. What, if any, identification did she make?

"A. She just said that the photograph of the first individual in the array looked similar to one of the two individuals.

"Q. And was that a subject involved as a suspect to this investigation at the time?

"A. No, ma'am."

Mrs. Hurdel was hypnotized by Dr. Daniel Stern, a Baltimore clinical psychologist, after she was unable to identify photographs in the array. The proceedings were recorded on videotape.

Motions to suppress any in-court identification by Mrs. Hurdel and the testimony of Mrs. Hurdel in Simkus' and McCoy's cases were heard simultaneously. We have referred in *Simkus*, 296 Md. at 722–24, 464 A.2d at 1058–59, to the trial judge's discussion of *Reed v. State*, 283 Md. 374,

391 A.2d 364 (1978), and its requirement that the standard enunciated in *Frye v. United States*, 293 F. 1013 (D.C.Cir. 1923), be applied to hypnotically enhanced testimony; his discussion of *State v. Mack*, 292 N.W.2d 764, 769–70 (Minn. 1980), and his mention of *State v. Hurd*, 173 N.J.Super. 333, 414 A.2d 291 (1980). *Hurd* was affirmed in *State v. Hurd*, 86 N.J. 525, 432 A.2d 86 (1981), but a short time before the trial judge's opinion in this case.

In his opinion Judge Fischer referred to each of the descriptions provided by Mrs. Hurdel which we have previously discussed, the composite sketches, and the failure of Mrs. Hurdel on March 3 to select the two-year old photograph of McCoy from the array. It must be remembered, of course, that at the time of the writing of his opinion Judge Fischer did not have available to him our opinion in *Collins*, 296 Md. 670, 464 A.2d 1028, which was not filed until about two years later. He said:

"This Court, however, does not believe that it necessarily follows, in light of the factual situation existing in this case, that Miss Hurdel's testimony must be excluded from the trial. It is clear to the Court that any evidence obtained through the use of hypnosis must be excluded. However, Miss Hurdel gave numerous statements prior to the hypnotic session and her recollection of the events given prior to the hypnosis is well documented. In view of this, the Court finds that she should be permitted to testify as to only those matters related by her in statements prior to the hypnosis and not to new information gained through hypnosis."

He then took up the issue of "whether or not the testimony of the State's witness, Debra Hurdel, [was] admissible in light of the concern of the defense that their right of cross-examination [had] been impaired by the hypnosis." He compared the facts with *Mack*, 292 N.W.2d at 769–70, and stated:

"In the case before this Court the hypnotic subject, Debra Hurdel, had significant independent recall that was verified and preserved by the five interviews and reports with

the police. In addition, she had a session with a police artist for the purpose of compiling composite drawings and two photo identification sessions, all prior to the hypnotic session. Further, proper safeguards were imposed on the hypnotic session which was conducted by a qualified clinical psychologist."

Judge Fischer concluded, after discussion of *Hurd,* 173 N.J.Super. 333, 414 A.2d 291, and other material:

"A review of the content of the witness interviews and witness's statements prior to the hypnosis and the recorded hypnosis session shows that there is no material deviation. The hypnosis session added scant information with no discernable value. The Court finds that the witness's statements, police reports and composite drawings are sufficient to determine a recollection independent from the hypnosis, and, in any event, the State met its burden of clear and convincing evidence that the hypnotic session was not unnecessarily suggestive. It is the opinion of this Court that the State would be severely handicapped if Debra Hurdel could not testify that she was with the victim, Deborah Ann Napieralski, in the accompaniment of the defendants on the night of the victim's disappearance. The testimony of the witness, Debra Hurdel, will however be confined to testimony not hypnotically induced."

In *Watson v. State,* 282 Md. 73, 382 A.2d 574, *cert. denied,* 437 U.S. 908, 98 S.Ct. 3100, 57 L.Ed.2d 1140 (1978), we quoted a trial judge's statement to the effect that he did not "believe the sequence of events as described to [him] by the defendant in th[at] case" relative to the administration of a polygraph test. We said:

"As Chief Judge Brune observed for the Court in *McDowell v. State,* 231 Md. 205, 211, 189 A.2d 611 (1963), 'The credibility of witnesses is primarily for the determination of the trier of facts. *McKenzie v. State,* 230 Md. 513, 514, 187 A.2d 885 [ (1963) ].' *Accord, Cunningham v. State,* 247 Md. 404, 417, 231 A.2d 501 (1967), *cert. denied,*

390 U.S. 908 [, 88 S.Ct. 832, 19 L.Ed.2d 877] (1968). Under Rule 886 'the judgment of the lower court will not be set aside on the evidence unless clearly erroneous....' " 282 Md. at 78, 382 A.2d at 577.

We find that standard applicable here to the trial judge's evaluation of the evidence relative to Mrs. Hurdel's prehypnotic identification of McCoy. Although he made no comment relative to the similarity between the actual photograph of McCoy, taken immediately after his arrest in this case, and the composite picture of McCoy, to which Mrs. Hurdel assigned a higher degree of accuracy than the one of Simkus, the similarity is striking.

McCoy relies upon *Metscher*, 297 Md. 368, 464 A.2d 1052. We reversed the conviction in that case saying, "In this case we have no demonstration that the testimony is in accordance with statements made prior to hypnosis." 297 Md. at 374, 464 A.2d at 1055. The cases are factually distinguishable. It does not appear in *Metscher* that the victim ever provided the type of detailed description of her assailant that Mrs. Hurdel here provided on a number of occasions. In this case the trial judge specified that Mrs. Hurdel's evidence was to be restricted to that which she observed prior to hypnosis.

We observe that the only difference between this case and *Simkus* is that in *Simkus* Mrs. Hurdel did prior to hypnosis identify a photograph of Simkus while here she did not identify one of McCoy when given the opportunity. This case is distinguishable from a case such as *Collins*, 296 Md. 670, 464 A.2d 1028, where at the first trial a witness testified that he was not in the victim's car at the time of the shooting, but after hypnosis was able to recall that he was actually in the car at the time of the shooting. In other words, here we do not have other facts coming to the surface subsequent to the hypnosis. We think there was an adequate base for the trial judge to conclude, as we believe he did conclude, that the identification of McCoy by Mrs. Hurdel was, to use the words of *Collins*, 296 Md. at 702, 464 A.2d at 1044, "in accord with statements which it

clearly can be demonstrated [s]he made prior to hypnosis."
Accordingly, we find no error.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE
COSTS.